## Thomas B. Blackstone *vs.* James M. Cashman.

Suffolk. October 3, 2006. - January 18, 2007.

Present: Marshall, C.J., Greaney, Ireland, Spina, Cowin, Sosman, & Cordy, JJ.

*Unlawful Interference. Practice, Civil,* Instructions to jury. *Malice.*

Discussion of the "actual malice" standard for proving improper motive or means on the part of a corporate official as an element of a claim of intentional interference with advantageous employment relations. [259-266] Cowin, J., dissenting, with whom Greaney and Spina, JJ., joined.

In a civil action alleging intentional interference with advantageous economic relations, the defendant, who was one of two directors of the company at issue, was a corporate official, regardless of his involvement in day-to-day operations [266-268]; therefore, the judge erred in not instructing the jury that, in order to prove that the defendant's actions were improper in motive or means, they had to find that the controlling factor in the defendant's alleged interference with the plaintiff's advantageous employment relation was actual malice [268-270], and the error resulted in prejudice to the defendant [270-271]. Cowin, J., dissenting, with whom Greaney and Spina, JJ., joined.

Civil action commenced in the Superior Court Department on June 2, 1998.

The case was tried before *Robert J. Kane*, J., and motions for judgment notwithstanding the verdict and for a new trial were considered by him.

After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.

*George C. Deptula* for the defendant.

*George P. Lordan, Jr.* (*Dennis P. Derrick* with him) for the plaintiff.

Cordy, J. This case is before us for the limited purpose of considering whether the defendant was entitled to an "actual malice" instruction when the plaintiff's claim of intentional interference with advantageous economic relations was submitted to the jury. To answer this question, we first consider what must be proved to establish that the interference was improper,

where the defendant is an official of the corporation that employed the plaintiff, and the economic relation allegedly interfered with is one of employment or prospective employment. We next consider whether the defendant's position as a corporate director and a fifty per cent shareholder qualifies him as a "corporate official" against whom actual malice must be established as an element of the plaintiff's claim. We then turn to the jury instructions.

We conclude that the defendant was entitled to an actual malice instruction, and that the failure to give such an instruction was prejudicial. Accordingly, the verdict is set aside and the judgment for the plaintiff is vacated.

1. *Background.* We summarize the evidence at trial. The plaintiff, Thomas B. Blackstone, an accountant, was employed by J.M. Cashman, Inc. (company), for approximately seven years beginning in 1988. By June, 1995, his title at the company was chief financial officer and vice-president, and he had a written employment contract expiring June 30, 1995. The defendant, James M. Cashman (Cashman), owned fifty per cent of the shares of the company and was a director. The remaining fifty per cent of the company shares were owned by Cashman's brother, Jay Cashman (Jay), who was also a director.

By August, 1994, the two brothers had become deadlocked over the direction of their business and entered into an agreement to wind up and liquidate the company. To supervise this process, they agreed to hire an outside manager to serve as the chief executive officer of the company. After the first manager hired left the company, David Ferrari assumed the duties of chief executive officer on May 5, 1995. Ferrari had complete day-to-day control of the business. Both Ferrari and Blackstone worked at the company's offices in Quincy. Cashman did not work at that location or visit it regularly.

The Cashman brothers did not involve themselves in the day-to-day management of the company. Ferrari, however, received and solicited advice from Jay on a regular basis; he almost never spoke with Cashman. Cashman's primary concern was that the business be run in an even-handed manner. He felt that the company's management had favored his brother, and had

expressed particular suspicion to Ferrari and others that Blackstone was biased against him.[1]

The events relevant to this suit occurred on June 5, 1995. As part of the windup agreement, each Cashman brother was due a check from the company for $20,000, payable monthly on the first day of the month. Blackstone was responsible for sending these checks. Cashman, concerned that he had not received his monthly check for June, and believing that Blackstone was improperly withholding it, telephoned Blackstone at the company office in Quincy.[2] In the telephone call, Cashman demanded that Blackstone send the check as required, but Blackstone refused. Blackstone testified that Cashman was irate and swore at him during the conversation but did not threaten him.[3] The call ended after approximately five minutes with Cashman telling Blackstone that he was going to call Ferrari.

Cashman then telephoned Ferrari, who took the call on a mobile telephone in his automobile. Cashman was highly agitated. He complained that Blackstone was improperly withholding his check, and insisted that Ferrari rectify the problem. During an outburst, Cashman used words to the effect that he would "go down and shoot [Blackstone]" or that he would "bash [Blackstone] over the head with a baseball bat"; and that this would be Ferrari's fault because of his failure to ensure fair treatment by Blackstone. Ferrari asked Cashman if he was serious, and Cashman said, "yes."[4] Ferrari promised Cashman that he would investigate the problem. The conversation turned to other business matters, and ended after approximately twenty-five minutes.

Following the telephone call, Ferrari attended a business meeting before returning to the company offices in Quincy.

---

[1] In his cross-examination at trial, Thomas B. Blackstone admitted to having said and written on several occasions that he favored Jay Cashman (Jay) over the defendant, James M. Cashman (Cashman).

[2] At the time of the call and a call made shortly thereafter to David Ferrari, Cashman was on Nantucket Island.

[3] Cashman denied swearing at Blackstone during the conversation, but the jury could have found otherwise.

[4] Cashman testified that he had no intention whatsoever of harming Blackstone, and that he spoke as he did out of anger and frustration.

There he spoke with Jay, and then to the company's attorney. Jay told Ferrari that he believed his brother's comments were driven by anger and were not serious threats to do harm to Blackstone. The attorney recommended that Ferrari send Blackstone home for the day, which he did without any explanation to Blackstone. Ferrari then spoke with Cashman's attorney, who similarly assured Ferrari that his client was not seriously threatening harm to Blackstone. Finally, later that same day, Cashman called Ferrari and assured him that his comments were an expression of his anger about his check and not a serious threat. He apologized to Ferrari for making the comments.

Blackstone did not learn of the comments until the next day, when Ferrari informed him. Blackstone became visibly agitated. Ferrari did not tell Blackstone about any of his subsequent conversations, including Cashman's apology. Rather, Ferrari discussed with Blackstone possible measures to safeguard the premises, including installing bulletproof glass. Blackstone then left the office.

Three days later, after a meeting which included Ferrari, the company's attorney, Cashman, and his attorney, Cashman signed a written letter of apology addressed to Ferrari. In that letter, he reiterated that his comments arose from his frustration and not from any serious intent, and he expressed embarrassment and remorse to Blackstone. Nonetheless, and despite repeated requests and assurances from Ferrari, Blackstone did not return to the company offices and worked from home until his contract expired at the end of the month. He testified that he remained "very, very concerned" that Cashman might come to the office to "finish me off." Ferrari testified that he would have retained Blackstone past the expiration of his contract had Blackstone wanted to stay. Blackstone, however, expressed no interest in doing any more work with the company in light of what had transpired.[5]

Blackstone instituted the present action on June 2, 1998, by filing a two-count complaint in the Superior Court. He alleged intentional interference with his employment contract and intentional interference with advantageous future relations —

---

[5]Blackstone had been contacting other prospective employers for several years.

that is, with the prospect of his continued employment with the company beyond the expiration of his contract. The case went to trial only on the claim of interference with future advantageous relations.[6] Before the case was submitted to the jury, Cashman requested an instruction on actual malice, which the judge declined. The jury returned a verdict in favor of Blackstone. Cashman's motions for judgment notwithstanding the verdict and for a new trial were denied. The Appeals Court affirmed. See *Blackstone* v. *Cashman*, 64 Mass. App. 1106 (2005). We granted Cashman's request for further appellate review, 445 Mass. 1107 (2005), on the limited question whether there should have been an instruction on actual malice.

2. *Intentional interference with advantageous relations.* The tort of intentional interference with advantageous relations protects a plaintiff's present and future economic interests from wrongful interference. The various species of this tort are described in Restatement (Second) of Torts §§ 766-766B (1979). This case involves interference described in § 766B(b),[7] in that Cashman allegedly interfered with Blackstone's prospective employment contract with a third party, the company,[8] by

---

[6]Blackstone did not pursue his contract claim because of a severance agreement with the company. The judge determined that this agreement was not relevant to Cashman's liability, but only to damages, and that it would confuse the jury. It therefore was not admitted in evidence. It is not relevant to our analysis, which relates to the jury instructions and verdict.

[7]Restatement (Second) of Torts § 766B (1979) provides:

> "Intentional Interference with Prospective Contractual Relation. One who intentionally and improperly interferes with another's prospective contractual relation (except a contract to marry) is subject to liability to the other for the pecuniary harm resulting from loss of the benefits of the relation, whether the relation consists of (a) inducing or otherwise causing a third person not to enter into or continue the prospective relation or (b) preventing the other from acquiring or continuing the prospective relation."

[8]Cashman's ownership of fifty per cent of the shares of J.M. Cashman, Inc., did not make him a party to Blackstone's employment contract. A party to a contract cannot be held liable for intentional interference with that contract. See *Harrison* v. *NetCentric Corp.*, 433 Mass. 465, 477-478 (2001). Although there may be cases in which a shareholder (particularly of a close corporation) is indistinguishable from the corporation, see *id.*, this is not such a case.

preventing him from acquiring or continuing the prospective relationship.[9]

To make a successful claim for intentional interference with advantageous relations, a plaintiff must prove that (1) he had an advantageous relationship with a third party (e.g., a present or prospective contract or employment relationship); (2) the defendant knowingly induced a breaking of the relationship; (3) the defendant's interference with the relationship, in addition to being intentional, was improper in motive or means; and (4) the plaintiff was harmed by the defendant's actions. See *Weber* v. *Community Teamwork, Inc.*, 434 Mass. 761, 781 (2001) (*Weber*). The "actual malice" instruction at issue here goes to the third element, whether the interference was "improper in motive or means."

We have often considered intentional interference with advantageous relations in the context of employment. See, e.g., *Weber, supra* at 781-783; *Harrison* v. *NetCentric Corp.*, 433 Mass. 465, 476-479 (2001); *Shea* v. *Emmanuel College*, 425 Mass. 761, 764 (1997) (*Shea*); *Boothby* v. *Texon, Inc.*, 414 Mass. 468, 486-488 (1993) (*Boothby*); *Wright* v. *Shriners Hosp. for Crippled Children*, 412 Mass. 469, 476 (1992) (*Wright*); *Gram* v. *Liberty Mut. Ins. Co.*, 384 Mass. 659, 663-665 (1981), *S.C.*, 391 Mass. 333 (1984) (*Gram*). That context affects how a plaintiff employee must prove the element of "improper motive or means," when the defendant is an official of the employer. In *Gram, supra*, a case involving the firing of an employee whose supervisors believed he was consistently violating company policies, we affirmed that "corporate officials" acting "within the scope of their employment responsibilities" are "privileged to act [unless they do so] out of malevolence, that is, with 'actual' malice." *Id.* at 663. We explained that the "rule assign-

---

[9]Other interference torts include intentional interference with the performance of a contract by a third person, see Restatement (Second) of Torts § 766, and intentional interference with another's performance of his own contract, see *id.* at § 766A. "We have not consistently distinguished" interference torts, and, in general, "we need not make any such distinction." *United Truck Leasing Corp.* v. *Geltman*, 406 Mass. 811, 815 n.6 (1990) (*Geltman*). See *Shafir* v. *Steele*, 431 Mass. 365, 369 (2000) (acknowledging our past recognition of Restatement [Second] of Torts §§ 766 & 766B, and explicitly adopting § 766A).

ing liability to corporate officials only when their actions are motivated by actual, and not merely implied, malice has particular force because 'their freedom of action directed toward corporate purposes should not be curtailed by fear of personal liability.' " *Id.* at 663-664, quoting *Steranko* v. *Inforex, Inc.*, 5 Mass. App. Ct. 253, 273 (1977), *S.C.*, 8 Mass. App. Ct. 523 (1979). See *Steranko* v. *Inforex, Inc.*, *supra* at 272-273 (collecting and explaining authorities for this proposition). We have further defined "actual malice" in these circumstances as "a spiteful, malignant purpose, unrelated to the legitimate corporate interest." *Wright*, *supra* at 476, quoting *Sereni* v. *Star Sportswear Mfg. Corp.*, 24 Mass. App. Ct. 428, 432-433 (1987). See *Boothby*, *supra* at 487. The "actual malice" standard for proving improper motive or means on the part of a corporate official is a burden placed on the plaintiff, not a defense that must be proved by the defendant.[10]

The dissent argues that the actual malice standard was long

---

[10]The use of the word "privilege" in the discussion in *Gram* v. *Liberty Mut. Ins. Co.*, 384 Mass. 659, 663 (1981), *S.C.*, 391 Mass. 333 (1984) (*Gram*), of "improper motive or means" creates an interpretive difficulty in that it implies an affirmative defense or protection that must be raised and proved by the defendant. In more recent cases we have moved away from using the word "privilege" altogether, treating the corporate official status as creating a heightened burden on the plaintiff rather than providing a defense that must be asserted by the defendant. See *Weber* v. *Community Teamwork, Inc.*, 434 Mass 761, 781-782 (2001) (*Weber*) (defining improper motive or means as actual malice, no mention of privilege); *Shea* v. *Emmanuel College*, 425 Mass. 761, 764 (1997) (*Shea*) (same). We now state explicitly what has been implicit in our prior cases: the "actual malice" standard for proving improper motive or means on the part of a corporate official is a heightened burden placed on the plaintiff, not a defense that must be proved by a defendant. Any reference to a corporate official's "privilege" in our prior cases should be construed accordingly. The avoidance of the word "privilege" does not make any substantive difference to the analysis in this case or in the precedents on which it relies. It merely draws a contrast with an older line of cases under which, after the plaintiff established that the defendant had intentionally interfered with a contract, it became the defendant's burden to prove "a privileged occasion existed upon which the defendant can rely as a justification for knowingly and intentionally causing damage to the plaintiff." *Owen* v. *Williams*, 322 Mass. 356, 360 (1948). Those cases spoke of a "privilege" because the Restatement of Torts § 766 applied to "one who, without a privilege to do so, induces [interference with advantageous relations]." The Restatement (Second) of Torts § 766 no longer uses the word "privilege." We proceed similarly.

ago rejected by this court, relying principally on *United Truck Leasing Corp.* v. *Geltman*, 406 Mass. 811 (1990) (*Geltman*), decided nine years after *Gram*. *Geltman* is inapposite because it did not concern a corporate official acting within the scope of his corporate responsibilities. Geltman was accused of interfering with the contractual and prospective contractual relationship between United Truck Leasing and one of its customers, by causing the customer to break its contract with United Truck Leasing and enter into a contract with another company. See *Geltman, supra* at 813. Geltman was not a corporate official of either United Leasing or the customer. He was not protected by the policy that provides corporate officials, acting within the scope of their responsibilities to the corporation, with the freedom to act in furtherance of corporate purposes. Geltman was merely an unrelated third party, accused of wrongfully interfering in the contractual relations of others. He was not entitled to an actual malice instruction under *Gram*.[11] It was in this context that we wrote that "malice, in the sense of ill will, has not been a true element of the [intentional interference torts]." *Geltman, supra* at 814.

We have not rejected the actual malice standard for corporate officials acting with regard to contractual or prospective contractual relations between the corporation and its employees. To the contrary, we have explicitly affirmed the applicability of the actual malice standard in such circumstances no less than five times since our 1990 decision in *Geltman*. See *Wright, supra* at 476 (hospital administrator had right to fire employee

---

[11]The same reasoning applies to another case cited by the dissent, *Draghetti* v. *Chmielewski*, 416 Mass. 808 (1994) (*Draghetti*). While the defendant in *Draghetti* was the plaintiff's supervisor in a local police department, the employment relationship with which the defendant interfered was not between the plaintiff and the police department, but between the plaintiff and a third party employer. See *Draghetti, supra* at 809-810. The supervisor gave false information to that third party employer so that it (not the police department) would terminate the plaintiff from another job. There was no interference alleged in the plaintiff's employment with the police department. Analytically, *Draghetti* is a third party interference case just like *Geltman*. The tortious act of the defendant in *Draghetti* can hardly be categorized as an act within the scope of his responsibilities as a police supervisor, thereby invoking the policy concerns our cases have discussed and rendering the defendant deserving of the actual malice protections afforded by *Gram* and its progeny. The *Geltman* standard was therefore properly applied in *Draghetti*.

"unless he did so malevolently, i.e., for a spiteful, malignant purpose unrelated to the legitimate corporate interest"); *Boothby, supra* at 487 (same, citing *Wright* and *Gram*); *King* v. *Driscoll,* 418 Mass. 576, 581 (1994) (*King*) (same, citing *Wright, Boothby,* and *Gram*); *Shea, supra* at 764 (where plaintiff employee complained that supervisor interfered with employment relationship, "[t]he improper motive or means required [to be proved] is 'actual malice.' . . . any 'spiteful, malignant purpose, unrelated to the legitimate corporate interest' "); *Weber, supra* at 781-782 (where claim for unlawful interference with advantageous relations is asserted against official of employer, employee must show that "as to 'improper motive or means' . . . the 'controlling factor' . . . was 'actual' malice [which] . . . in this context means 'a spiteful, malignant purpose, unrelated to the legitimate corporate interest of the employer' " [citations omitted]).

These precedents confirm the actual malice standard by repeated use of the term and recitation of its definition. The dissent suggests that these cases "simply used 'actual malice' as a synonym for *Geltman*'s 'improper motive or means requirement.' " *Post* at 273. Then, citing the discussion of intentional interference in *King, supra* at 587, the dissent states that the *King* "opinion cites to [the actual malice cases cited above] and *Geltman* interchangeably, shifting seamlessly between the language and principles of both." The dissent implies that this passage in *King* somehow suggests that the term "actual malice" has been used since *Geltman* solely to express *Geltman*-style "improper motive or means." We disagree. That would render meaningless the substantively higher burden implied by "a spiteful, malignant purpose." In the passage from *King* quoted by the dissent, *Boothby, supra,* and *Wright, supra,* are cited for the proposition that actual malice means "a spiteful, malignant purpose unrelated to the legitimate corporate interest." *Geltman,* however, is cited for a separate and logically distinct proposition, that "personal gain" on the part of a defendant is never sufficient to establish improper motive or means (and, necessarily, actual malice).[12]

The dissent next rests its argument on the last sentence of a

[12]There is also no force in the dissent's observation that "nothing in the

footnote in *Harrison* v. *NetCentric Corp.*, 433 Mass. 465, 479 n.16 (2001). In that footnote, the court noted that after *Geltman*, we have "continued to define the improper interference required before a corporate officer could be liable in terms of 'actual malice,' " and went on to state, without further explanation, that "[t]here is no practical difference, however, between 'actual malice' and *improper* motives and means for purposes of this tort" (emphasis in original). *Id.* We do not read into this statement, made in dictum,[13] an intent to abolish the longstanding actual malice standard applicable to cases such as the one before us.

The dissent accounts for this footnote by arguing that it "attempted to alleviate" the "confusion" resulting from our application of the actual malice standard in the *Weber, Shea, King, Boothby*, and *Wright* cases by "reaffirm[ing] *Geltman's* characterization of the inquiry into the nature of the defendant's actions as whether such actions are 'improper in motive or means,' regardless of whether the defendant is a corporate official . . . ." *Post* at 274. Yet this "*Geltman* inquiry" was not relevant to those other cases, as their facts implicated an "actual malice" standard while the facts in the *Geltman* decision did not. There was no confusion to alleviate in this area of the law.

cases cited by the majority turned on a distinction between 'actual malice' and 'improper motive or means' — the results would have been identical under either formulation." *Post* at 274, citing *Weber, supra; Shea, supra; King* v. *Driscoll*, 418 Mass. 576, 587 (1994); *Boothby* v. *Texon, Inc.*, 414 Mass. 468, 487 (1993); and *Wright* v. *Shriners Hosp. for Crippled Children*, 412 Mass. 469, 476 (1992). The results would have been identical under either standard in those cases only because in none of them was the evidence sufficient even to meet the lower "improper motive or means" standard, and consequently summary judgment was granted for the defendant officers on the interference claims. A plaintiff who cannot prove that a defendant's actions were "improper motive or means" of necessity cannot prove "actual malice." Nevertheless, had the plaintiffs in those cases had sufficient evidence to get to a jury, they would have been required to prove actual malice. Only in this case are we faced with facts apparently sufficient to meet the lower standard, but not the higher.

[13] In *Harrison* v. *NetCentric Corp.*, 433 Mass. 465, 479 (2001), the court did not reach the question whether the plaintiff's termination was based on improper motive or means, and whether actual malice would be required to prove that element, because the plaintiff had agreed in his at will employment contract that his employment could be interfered with in the very manner that prompted his subsequent complaint.

Tellingly, in the next case the court decided on the subject after *Harrison* v. *NetCentric Corp.*, *supra*, it reaffirmed that the actual malice standard was the correct standard to apply when an unlawful interference claim is asserted by an employee against an official of the employer. See *Weber, supra* at 781.

The dissent then gets to the real heart of its disagreement with our conclusion: it rejects the very idea that there should be a higher standard "that is more difficult to prove and is applicable only to certain defendants," i.e., corporate officials. This is motivated by a concern that the result here will "require giving corporate officials greater license to commit torts in circumstances far beyond this case." *Post* at 275. While we respect this concern, we do not find it decisive here.[14] What the dissent provides is the outline of a policy argument that we should change the law by eliminating the actual malice standard, rather than a convincing argument that we have in fact already done so. Our cases have consistently held to the contrary, concluding that a heightened standard is necessary to protect the freedom of corporate officers in certain circumstances.[15] The present case was briefed and argued on the limited question whether the trial judge applied the proper standard to the facts at hand. Thus, our task here is more narrow than the dissent's policy argument would have it. We must simply ask whether, based on our past precedents, the factual structure of this case warranted an actual malice instruction.

In sum, the dissent errs by discounting the clear distinction

---

[14]The factual circumstances to which the actual malice standard applies are constrained. Company officials do not qualify for the standard with respect to all actions taken on behalf of the company. It is applicable only where the relationship allegedly interfered with is with the company itself: e.g., whom to hire, whom to discipline, whom to fire, with whom to do business. While the dissent characterizes the actual malice standard as giving "corporate officials greater license to commit torts in circumstances far beyond this case," this greatly overstates the applicability of the standard.

[15]We disagree with the dissent's characterization of the higher standard for corporate defendants as "disquieting." *Post* at 275. As explained in *Gram* v. *Liberty Mut. Ins. Co.*, 384 Mass. 659, 663-664 (1981), this differing treatment stems from the principle that, in matters related to the conduct of the internal affairs of a corporation, corporate officials require a heightened level of protection from liability. See *Steranko* v. *Inforex, Inc.*, 5 Mass. App. Ct. 253, 272-273 (1977), *S.C.*, 8 Mass. App. Ct. 523 (1979) (collecting and explaining authorities for proposition).

our cases have drawn between employer-employee interference cases like *Gram*, and third party interference cases like *Geltman*. As a result, it erroneously treats "actual malice" as lacking any meaning or application independent of the "improper in motive or means" standard. This argument produces a result that is plainly contradicted by our most recent precedent, *Weber, supra* at 781. It also conflates a policy debate about the wisdom of the actual malice standard with the narrower question on which we granted review in this case.

3. *"Corporate official."* Blackstone argues that because Cashman was not involved in the "day-to-day" operation of the company, he was not a "corporate official" for purposes of this tort. Therefore, Blackstone contends that the "actual malice" standard does not apply. We disagree.

The actual malice standard applies when "the claim is asserted against an individual official of the employer." *Weber, supra* at 781. Our cases do not explicitly define "individual official." They do, however, treat the term expansively. We have applied the actual malice standard to high level corporate officers, as well as directors involved in management. See *id.* (executive director); *Harrison* v. *NetCentric Corp., supra* at 478 (chief executive officer); *King, supra* at 587 (shareholder-directors actively involved in management); *Boothby, supra* at 487 (one vice-president sued by another vice-president). We have also applied that standard to supervisors who are not corporate officers, when the plaintiff was under their supervision. See *Shea, supra* at 764 (nonofficer immediate supervisor of employee); *Gram, supra* at 663 (same). Although it appears that the defendants in these cases were more involved in the day-to-day operation of their respective companies than Cashman was here, nothing in these precedents requires a defendant to make a threshold showing of day-to-day involvement in order to be treated as a "corporate official" entitled to the protections of the actual malice standard when his actions are "directed toward corporate purposes." *Gram, supra* at 663-664.

In concluding that Cashman is a corporate official for present purposes, we rely primarily on his status as one of only two

directors of the company.[16] It is a basic principle of our corporate law that a director has a fiduciary relationship with the corporation. See, e.g., *American Discount Corp.* v. *Kaitz,* 348 Mass. 706, 711 (1965). This relationship includes duties of loyalty and of care — that is, of "reasonable intelligence" in the oversight of corporate business. See *Spiegel* v. *Beacon Participations, Inc.*, 297 Mass. 398, 410-411 (1937) (listing duties). See also *Production Mach. Co.* v. *Howe,* 327 Mass. 372, 377 (1951) (director obliged "reasonably to protect the interests of the corporation"). These duties are underscored by the business corporations law, which vests all corporate powers in the directors, provides that "the business and affairs of the corporation shall be managed under [their] direction," and establishes standards for their conduct in office. See G. L. c. 156D, §§ 8.01 (duties of directors), 8.30 (standards for directors).

The degree to which a director involves himself in day-to-day corporate affairs has little bearing on the nature or extent of his duties. See, e.g., *Demoulas* v. *Demoulas Super Mkts., Inc.*, 424 Mass. 501, 528-543 (1997) (in suit alleging violation of fiduciary duties, propriety of various directors' actions analyzed without regard to their very different levels of participation in company business). Even if the daily management is wholly in the hands of a consultant executive, as in this case, a director like Cashman still maintains an interest in (and certain responsibilities for) the proper management of the company and, in this case, its orderly wind-up.

In sum, a corporate director, whatever the frequency of his involvement in day-to-day operations, has an important interest in and responsibility for the conduct of business by the company's corporate officers. A director therefore qualifies as a corporate official for purposes of the tort of intentional interference with advantageous relations, when he acts in furtherance of a legitimate corporate purpose. Consequently, Blackstone had the burden of proving that Cashman acted with "actual malice" "unrelated to [a] legitimate corporate interest." *Boothby, supra* at 487.

---

[16]Because Cashman was a director, we need not reach the question whether, in a close corporation, simply being a shareholder is sufficient to qualify a defendant as a "corporate official."

Blackstone further argues that Cashman should not be accorded the protected status of a corporate official because his threats were motivated by his personal animus toward Blackstone rather than by any legitimate interest in receiving the agreed upon payment from the corporation, contending that while the latter may have prompted his call to Ferrari, it was the former that governed its contents. This argument, in effect, asks us to treat Cashman as a corporate official (and therefore entitled to an actual malice standard) only with respect to the specific request for his check, but not with respect to the threats prompted by having not received it.

Such parsing is tantamount to fact finding, and is best left to the jury. While it is plausible that a jury might conclude that the check was a pretext for making threats, it is equally plausible that a jury might conclude that Cashman's statements were ill-advised hyperbole directly related to his frustration at the late payment. The statements are intertwined, and their interpretation dependent on context and credibility.

It also makes no difference to his status as a "corporate official" that the interest pursued by Cashman was the payment of money to himself. Cf. *King, supra* at 587 ("The motivation of personal gain, including financial gain . . . is not enough to satisfy the improper interference requirement"). Under the agreement governing the wind-up, payments were due to him (as a shareholder) from the corporation at the first of each month. As a director, Cashman acted within the scope of his responsibilities in demanding that corporate officers like Blackstone and Ferrari meet the obligations of the corporation to him. The determination whether that was the purpose behind Cashman's statements to Ferrari rests in the province of the jury.

4. *Jury instructions.* Because Cashman was a corporate official accused of interfering with Blackstone's prospective employment with the company, he was entitled to an actual malice instruction. Although he requested such an instruction, the trial judge declined to give it. This was error.

The trial judge submitted the case to the jury by way of special questions. The question relating to the element of improper motive or means read, "Did James Cashman improperly interfere with Thomas Blackstone's prospective employ-

ment with Cashman Company?" There was no mention of the actual malice standard either on the special verdict sheet or in the judge's instructions. Rather, the judge instructed the jury to "focus your attention upon the element of means, not motive or purpose," and told them, "As to means, specifically the threat, you [the jurors] as the conscience of this community, should ask if [Cashman's] conduct considered in light of contemporary [mores], business ethics, and community customs was wrongful . . . ."[17]

When considered together with the judge's instructions, the relevant special question effectively divides up the "improper in motive or means" element into two parts — one relating to motive, and one relating to means — with proof of either being sufficient to meet Blackstone's burden. Apparently, the judge believed that any higher standard deriving from Cashman's position as a director applied only to his motive (getting his money), not to his means (threats).

This instruction does not accurately convey the application of the heightened actual malice standard to the "improper in motive or means" element. We have not applied the actual malice standard to motive and means separately.[18] Rather, when applying the actual malice standard, we have engaged in a single analysis of the entirety of the defendant's relevant conduct.[19] "Improper motive" and "improper means" become subsumed into the more stringent analysis implied by "actual malice." See, e.g., *Boothby*, *supra* at 487 (defining "actual malice" as "spiteful, malignant purpose" without separate mention of mo-

---

[17]The judge then went on to charge that "a finding by you [the jury] of a threat to do bodily harm or kill would warrant a conclusion that [Cashman's] conduct was improper."

[18]We have permitted plaintiffs to prove either improper motive or improper means in cases in which the actual malice standard is not applicable. See, e.g., *United Truck Leasing Corp.* v. *Geltman*, 406 Mass. 811, 816 (1990) (in commercial context, liability may arise from improper motives or improper means); *Draghetti* v. *Chmielewski*, 416 Mass. 808, 816 n.11 (1994) (where plaintiff's supervisor caused third party organization to fire plaintiff from his second job, proof of either improper motive or means adequate).

[19]In that single analysis of "actual malice" the jury may, of course, consider both the defendant's means and motive to determine if actual malice is shown. Indeed, means is a window into motive and, by extension, into malice. Means is not, however, conclusive of motive.

tive or means). Thus, the actual malice standard in effect replaces the disjunctive analysis "improper in motive or means" with a single question, whether the controlling factor in the alleged interference was actual malice. See *Weber, supra* at 781. Accordingly, when the defendant is a corporate official, the improper motive or means element should be formulated as whether the controlling factor in the defendant's interference was actual malice — that is, a spiteful, malignant purpose unrelated to a legitimate corporate interest. See *id.* at 781-782.

5. *Prejudice.* An error in jury instructions is not grounds for setting aside a verdict unless the error was prejudicial — that is, unless the result might have differed absent the error. See Mass. R. Civ. P. 61, 365 Mass. 829 (1974). See also *Abramian* v. *President & Fellows of Harvard College*, 432 Mass. 107, 118-119 (2000) (analyzing remedy for erroneous jury instructions in terms of prejudice); *S. Solomont & Sons Trust* v. *New England Theatres Operating Corp.*, 326 Mass. 99, 110 (1950) ("substantial rights of the plaintiffs are not injuriously affected if the course taken reaches the inevitable result of the case"). We must therefore determine if Cashman suffered any prejudice from the lack of a malice instruction.

The jury answered "yes" to the question whether Cashman "improperly interfere[d]" with Blackstone's prospective employment. As set forth above, they should have been asked whether the controlling factor in Cashman's alleged interference was "a spiteful, malignant purpose, unrelated to [a] legitimate corporate interest." Nevertheless, if the jury's answer necessarily implied a finding of actual malice, the error would not be prejudicial.

By instructing the jury to focus on "means, specifically the threat," the judge unduly narrowed the range of the jurors' consideration. Given the evidence presented at trial, the jury had sufficient grounds to conclude two very different things. They might have found that Cashman's demand to receive his check and the threats he made were indeed separate, divisible parts of the conversation, with the threats evidencing spiteful, malignant purpose unrelated to corporate interest. Alternatively, they might have found that the threats were integral to Cashman's business-related purpose and complaint, an unfortunate

result of his anger and frustration at what he perceived to be another example of Blackstone's bias against him in the carrying out of corporate responsibilities. Either one of these findings would be consonant with the conclusion that the threats were "wrongful" by "contemporary mores," resulting in a "yes" to the interrogatory. Only the first conclusion, however, would constitute a finding of actual malice.

If the threats Cashman made were found to be part and parcel of the expression of his business concern, that would not necessarily imply that he acted with actual malice. Personal financial gain and personal dislike "will not warrant an inference of the requisite ill will" to establish actual malice. *King, supra* at 587. Nor do we think that an angry and ill-advised outburst necessarily warrants such an inference.

This is not to say that the outburst was not relevant evidence of actual malice. To the contrary, it was highly relevant. It was not, however, conclusive on that point. Given that the threats were made to someone other than Blackstone (to Ferrari), outside of his hearing, and were withdrawn and clarified before Blackstone even knew they had been made, the jury might have believed that Cashman was merely angry and did not seriously intend to threaten or do Blackstone any harm or to have the company's relationship with him terminated for an illegitimate purpose. Such behavior may be condemned by "contemporary mores" without rising to the level of a "spiteful, malignant purpose unrelated to [a] legitimate corporate interest." As a consequence, we cannot say that the jury's answer to the special question implied a finding of actual malice as required in this case. When "we cannot ascertain on which theory the jury relied, the verdict . . . cannot stand." *Abramian* v. *President & Fellows of Harvard College, supra* at 119, quoting *Slate* v. *Bethlehem Steel Corp.*, 400 Mass. 378, 384 (1987).

We must therefore set aside the verdict and vacate the judgment. The case is remanded to the Superior Court for a new trial.

*So ordered.*

COWIN, J. (dissenting, with whom Greaney and Spina, JJ.,

join). In *United Truck Leasing Corp.* v. *Geltman*, 406 Mass. 811 (1990) (*Geltman*), we stated:

> "[M]alice, in the sense of ill will, has not been a true element of the torts of intentional interference either with a contract or with a prospective contractual relation. Some of our cases have used the word but, in the same breath, have eliminated any requirement of independent proof of malice."

*Id.* at 814, citing *Pino* v. *Trans-Atl. Marine, Inc.*, 358 Mass. 498, 504 (1970), and Restatement of Torts § 766 comment m, at 62 (1939). See Restatement (Second) of Torts § 766 comment r, at 16 (1979) ("Ill will on the part of the actor toward the person harmed is not an essential condition of liability . . . . He may be liable even when he acts with no desire to harm the other"). We went on to "abandon the word malicious in the description of any element of these torts" and, following the Restatement (Second) of Torts, to "adopt the word 'improperly' in place of the word 'maliciously.' " *United Truck Leasing Corp.* v. *Geltman, supra* at 815-816. We recognized that "improper" can refer to either improper motive or improper means, *id.* at 816-817 & n.10, and, as the court acknowledges, that is how we have consistently stated this element of the tort. *Ante* at 260. See *Weber* v. *Community Teamwork, Inc.*, 434 Mass. 761, 781 (2001); *Harrison* v. *NetCentric Corp.*, 433 Mass. 465, 476 (2001); *Abramian* v. *President & Fellows of Harvard College*, 432 Mass. 107, 122 (2000); *G.S. Enters., Inc.* v. *Falmouth Marine, Inc.*, 410 Mass. 262, 272 (1991). Nowhere in *Geltman* did we say that a different formulation of this element, still employing the term "malice," would apply to some defendants but not others.

Despite *Geltman*'s explicit abandonment of the term "malice," several subsequent tortious interference cases, with little or no citation to *Geltman*, required plaintiffs to prove "actual malice."[1] See, e.g., *Weber* v. *Community Teamwork, Inc., supra* at 781; *Shea* v. *Emmanuel College*, 425 Mass. 761, 764 (1997);

---

[1] It is not a coincidence that those cases involved corporate official defendants and arose in the employment context. They drew on an earlier body of case law, which the court recognizes as now defunct, *ante* at 261 n.10, in which

*King* v. *Driscoll*, 418 Mass. 576, 587 (1994); *Boothby* v. *Texon, Inc.*, 414 Mass. 468, 487 (1993). However, the post-*Geltman* cases on which the court relies, rather than creating an ambivalent tort with two confusingly different standards, simply used "actual malice" as a synonym for *Geltman*'s "improper in motive or means" requirement.[2] For instance, in *King* v. *Driscoll, supra*, Chief Justice Liacos's opinion cites to these cases and *Geltman* interchangeably, shifting seamlessly between the language and principles of both:

> "One of the elements of intentional interference with contractual relations is improper motive or means on the part of the defendant. *Wright* [v. *Shriners Hosp. for Crippled Children*, 412 Mass. 469, 476 (1992)]. We have said that the improper motive or malevolence required is 'actual malice,' *Boothby* v. *Texon, Inc.*, 414 Mass. 468, 487 (1993), citing *Gram* [v. *Liberty Mut. Ins. Co.*, 384 Mass. 659, 663 (1981), *S.C.*, 391 Mass. 333 (1984)], 'a spiteful, malignant purpose, unrelated to the legitimate corporate interest.' *Wright, supra*, quoting *Sereni* v. *Star Sportswear Mfg. Corp.*, 24 Mass. App. Ct. 428, 433 (1987). The motivation of personal gain, including financial gain, however, generally is not enough to satisfy the improper interference requirement. *United Truck Leasing Corp.* v. *Geltman*, 406 Mass. 811, 817 (1990). . . . Here, the judge identified only the motives of personal and financial gain. We perceive no reason why our conclusion in *United Truck Leasing Corp., supra*, should not be applied to this case."

*King* v. *Driscoll, supra* at 587.

corporate official defendants could raise a "privilege" to interfere with a plaintiff's contractual relations by way of affirmative defense, which the plaintiff could then rebut by a showing of "express malice." See, e.g., *Owen* v. *Williams*, 322 Mass. 356, 360-361 (1948). That the post-*Geltman* opinions into which the term "actual malice" crept are an artifact of this abandoned approach is evident from references to actual malice as negating a corporate official defendant's "privilege." See *Weber* v. *Community Teamwork, Inc.*, 434 Mass. 761, 783 (2001); *Boothby* v. *Texon*, 414 Mass. 468, 487 (1993).

[2]While certain post-*Geltman* cases may have, understandably, employed terms such as "actual malice" and "privilege" that were vestiges of factually similar pre-*Geltman* cases, they did not overrule *Geltman* by embracing a substantively different standard.

Furthermore, nothing in the cases cited by the court turned on a distinction between "actual malice" and "improper motive or means" — the results would have been identical under either formulation. The plaintiffs in these cases did not establish anything amounting to improper motive or means under *Geltman.* See *Weber* v. *Community Teamwork, Inc., supra* at 782 (only evidence considered was that defendant fired plaintiff in rude manner and replaced her with someone arguably less qualified); *Shea* v. *Emmanuel College, supra* at 764 (plaintiff's employment terminated due to her own performance problems); *King* v. *Driscoll, supra* at 587 (defendants fired plaintiff for financial gain, which was held insufficient in *Geltman*); *Boothby* v. *Texon, Inc., supra* at 487 (defendant "had poor 'people skills' and had engendered low morale"); *Wright* v. *Shriners Hosp. for Crippled Children, supra* at 476 (assuming that defendant fired plaintiff for criticizing employer). Thus, a double standard for tortious interference claims is not required to explain the results in our prior cases.

We recognized the confusion created by these cases and attempted to alleviate it, albeit unsuccessfully, in *Harrison* v. *Net-Centric Corp., supra,* a case where, as here, the defendant was a "corporate official"[3] accused of interfering in the plaintiff's employment. In that case, we reaffirmed *Geltman*'s characterization of the inquiry into the nature of the defendant's actions as whether such actions are "improper in motive or means," regardless of whether the defendant is a corporate official:

> "In an effort to clarify the law in this area, we note that in *United Truck Leasing Corp.* v. *Geltman,* 406 Mass. 811, 815-817 (1990), we stated that we were 'abandon[ing] the word malicious in the description' of the elements of a tortious interference claim, but we continued to define the improper interference required before a corporate officer could be liable in terms of 'actual malice.' . . . *There is no practical difference, however, between 'actual malice' and improper motives and means for purposes of this tort*" (emphasis added). (Citations omitted.)

---

[3]There is nothing in the court's use of the term "corporate official" that necessarily limits it to officials of entities that use the corporate form, rather than officials of any enterprise, however organized.

*Harrison* v. *NetCentric Corp.*, *supra* at 479 n.16. Thus, we disavowed any notion of a substantively higher "actual malice" standard applicable only to corporate officials.

The court now reintroduces the confusing term "actual malice" into the equation, notwithstanding our previous disavowal of it. In doing so, the court suggests, erroneously, that there is a heavier burden for plaintiffs to meet if they assert tortious interference against corporate officials. In effect, the court posits a separate tort of *"malicious* interference" that is more difficult to prove and is applicable only to certain defendants. According to the court, corporate officials require this additional protection because "their freedom of action directed toward corporate purposes should not be curtailed by fear of personal liability." *Ante* at 261, quoting *Gram* v. *Liberty Mut. Ins. Co.*, *supra* at 663-664. This argument, however, proves too much. It would require giving corporate officials greater license to commit torts in circumstances far beyond this case, and creates the disquieting inference that such officials, simply by virtue of their position, are entitled to a level of protection from tort liability that other defendants are not.

Another flaw in the "actual malice" standard is its myopic focus on motive to the exclusion of means, despite the clearly disjunctive nature of the "improper in motive *or* means" element of the tort.[4] See *Draghetti* v. *Chmielewski*, 416 Mass. 808, 816 n.11 (1994) ("*Draghetti* only need offer evidence of either improper means *or* motive. [He] did not have to prove both" [emphasis in original]); *Geltman*, *supra* at 816-817 & n.10 (plaintiff may establish liability by showing either improper motive *or* improper means); Restatement (Second) of Torts § 767 comments c & d, at 29-33 (1979) (both motive and means considered in determining whether interference is improper). The only significant difference between the two standards is that the court's insulates from liability those corporate officials who, without a "spiteful, malignant purpose," nonetheless interfere in employment contracts through, for instance, mis-

---

[4] I find puzzling the court's statement that, in cases involving corporate officials, " '[i]mproper motive' and 'improper means' become subsumed into the more stringent analysis implied by 'actual malice.' " *Ante* at 269. It would seem that an improper means either is sufficient for liability or it is not.

representations or threats. See Restatement (Second) of Torts § 767, comment c at 30-31 (citing examples of improper means). In other words, no matter how egregious the means employed, the court's rule does not impose liability unless the plaintiff can also prove a "spiteful" or "malignant" state of mind. Such a rule leads to a particularly perverse result in this case, where the defendant was found to have interfered with the plaintiff's employment through threats to shoot him or attack him with a baseball bat. *Ante* at 257. The jury were unquestionably entitled to find this an "improper means"; yet the court remands the case because the jury did not necessarily find, in addition, that the defendant made the threats of physical harm with a "spiteful, malignant purpose."

While the court insists that corporate officials will not be able to do their jobs without the security of an "actual malice" standard for tortious interference, at no point does the court state what purpose an "actual malice" standard serves that the "improper in motive or means" standard of *Geltman* does not. The *Geltman* standard does not impose liability on a corporate official who, in good faith and within the scope of his authority, does his job with the motive of fulfilling his obligations to his employer, even if his judgment is wrong and a third party suffers as a result. On the other hand, if that official acts purposefully not for the benefit of the business enterprise, but rather to injure the third party because of a bias or a personal vendetta, he is exposed to a claim of tortious interference, as he should be. Each of these paradigms is intelligently addressed by asking whether the official acted with improper motive or by improper means. An inquiry into whether he acted with "actual malice" is worse than unnecessary; it creates a fictitious element that is confusing and, because it has the potential to insulate business people from claims for which they should be liable, extremely poor public policy.

Indeed, it is interesting to note that just recently, we unanimously rejected the use of "malice" as an element of another tort, malicious prosecution, and instead "adopt[ed] the 'improper purpose' formulation in § 676 of the Restatement (Second) of Torts . . . ." *Chervin* v. *The Travelers Ins. Co.*, 448 Mass. 95, 110 (2006). There, as in *Geltman*, we recognized

that the word "malice" is not helpful in distinguishing between tortious and lawful conduct, and that the simpler and more logical inquiry is, instead, whether the conduct is improper.

Because I believe that the trial judge's instructions adequately explained the law as defined in *Geltman* and in the Restatement, and because a return to the concept and term "actual malice" is, in my view, an unwelcome and confusing step backward, I respectfully dissent.