Fabricant, Judith, J.
This action arises from an agreement under which plaintiff Jason Calianos, d/b/a Calianos Insurance Agency, served as the appointed broker for motor vehicle insurance for defendant The Commerce Insurance Company. Now before the Court is Commerce’s motion for summary judg *317 ment and motion to strike. For the reasons that will be explained, the motions will be allowed.
BACKGROUND
The record before the Court reveals the following facts as undisputed. Massachusetts requires that all drivers obtain automobile insurance. Arbella Mut. Ins. Co. v. Commissioner of Ins., 456 Mass. 66, 68 (2010); see also G.L.c. 90, §34J. Some drivers, however, are unable to do so in the voluntary market because insurers view them as “high risk.” The system by which these drivers obtain insurance is known as the “residual,” “high risk” or “involuntary” market. Prior to April 2008, the residual market operated as a reinsurance pool, administered by Commonwealth Automobile Reinsurers (CAR), under rules it promulgated.[1] All insurers licensed to write motor vehicle insurance in the Commonwealth, known in the industry as “Servicing Carriers,” were required to become members of CAR. All such insurers, including Commerce, had to accept all high risk applicants, but had the option of ceding the profits and losses from such policies to the residual market. The residual market reinsured those risks, although the responsible insurer continued to administer the ceded policies. This system was known as “take all comers.” See, e.g., Commerce Ins. Co. v. Commissioner of Ins., 447 Mass. 478, 486 (2006).
An insurance agent who was unable to obtain a voluntary contract with an insurer could apply to CAR to be assigned as an Exclusive Representative Producer (ERP). CAR appointed each ERP to an insurer, using a formula designed to distribute premiums, losses and expenses of the residual market to carriers according to their market share. Under Rule 13 of CAR’s Rules of Operation insurers had to accept ERP appointments from CAR, and had to “(p)rovide a contract signed by an authorized company representative ... to a qualified newly assigned or reassigned ERP within 15 days of the Servicing Carrier’s receipt of the assignment by CAR.” An insurer could, however, enter into a contract with an ERP that defined or expanded the scope of the parties’ relationship, so long as such contract did not conflict with CAR’s rules or any statute or regulation governing the insurance industry
In 2006, CAR assigned Calianos as an ERP to Commerce. Commerce and Calianos entered into a contract, effective March 1, 2006, labeled “Exclusive Representative Producer Agreement.” The agreement, at §I(a), authorized Calianos to “solicit, bind, execute, and deliver motor vehicle policies” for Commerce. The agreement provided, however, that Calianos’s authority is:
limited to those kinds of motor vehicle insurance for which Exclusive Representative Producer has been appointed by [CAR] to represent [Commerce] and is subject to . . . the CAR Rules of Operation, CAR Plan of Operation, CAR Manual of Administrative Procedures, CAR bulletins and instructions.
The agreement further provided that Commerce retained the right to cancel or non-renew any policy at any time upon notice to Calianos, “as permitted by law.” The agreement obligated Commerce to pay Calia-nos commissions, and gave him the right to renewal business. The agreement had no expiration date, but provided that it “shall continue in full force and effect until amended, superseded or terminated.” The agreement authorized Commerce to terminate it on written notice “for any reason permitted by CAR Rules of Operation,” and also to amend it unilaterally “upon not less than one hundred eighty (180) days notice.”
In 2004, the Commissioner of Insurance approved a structural change in the residual market, replacing the reinsurance pool with an “assigned risk plan.” See Arbella, 456 Mass. at 69. Under this plan, “an insurer is assigned policies issued to high-risk drivers in proportion to the insurer’s voluntary market share. The insurer must absorb the losses from that policy itself; there is no central pool to which to cede the policy.” Id. The assigned risk plan is known as the Massachusetts Automobile Insurance Plan (MAIP). Rules 21-40 of MAIP “establish policies and certain procedures by which insurers and agents are to be governed with regard to the operation of, and participation in, the MAIP.” https://www.com-mauto. com /maip /manuals /rules. asp.[2]
MAIP became effective April 1, 2008, with a one-year transition period ending March 31, 2009. MAIP Rules of Operation, Rule 21, §B. MAIP Rule 21, §B(4) mandates, as to any private passenger motor vehicle policy with an effective date on or after April 1, 2009, that a carrier must either write the policy voluntarily, or decline and refer it for placement under MAIP. Thus, insurers can now choose the customers to whom they will issue policies, with those an insurer rejects assigned through MAIP to Assigned Risk Carriers. Agents are no longer assigned on an involuntary basis to insurers; only one form of agents, known as Assigned Risk Producers (ARPs), services the residual market. All licensed property and casualty agents must become certified as ARPs to place business in the personal automobile residual market. As the Commissioner of Insurance stated, “ERPs legally ceased to exist on April 1, 2009, when the door to the former reinsurance pool of the residual market closed and MAIP became the sole residual market for private passenger automobile insurance in Massachusetts.” Report to the Joint Committee on Financial Services of Effort Made to Facilitate the Transition of Exclusive Representative Producers to Voluntary Agents, Massachusetts Division of Insurance, July 13, 2009.
In an effort to restrict the size of the residual market and facilitate the movement of policies to the competitive market, MAIP Rule 21 (D) prohibited insurers from non-renewing so-called “Clean-in-Three” risks until *318 April 1, 2011. An insured is “Clean-in Three” if the driver has not had an accident or moving violation for the three-year period immediately preceding the application for insurance or renewal. Thus, an agent who had been assigned to an insurer as an ERP before MAIP, but was then unable to obtain a voluntary appointment with the same insurer, could still have existing Clean-in-Three policies renewed by that insurer until April 1, 2011.
By letter dated January 23, 2009, Commerce informed Calianos that it had decided not to extend to him a voluntary private passenger automobile appointment, and that, “by operation of’ the rules of MAIP, “your authority to solicit and bind Commerce Insurance to certain business under your Exclusive Provider Agreement. . . will be reduced.” Specifically, the letter indicated, as of April 1,2009, Calianos would no longer have authority to solicit or bind new policies, and Commerce would “non-renew” Caliano’s existing policies except those that “meet the'definition of Clean in Three.” As to the latter, Calianos would continue to have authority to bind Commerce, and to service the policies, until 201 i.
Thereafter, Commerce issued notices of non-renewal to Calianos’s customers who Commerce determined did not meet the definition of Clean-in-Three. As to some renewal applications, Commerce applied the definition in a manner that the Division of Insurance later determined to be incorrect.[3] Calianos complained to Commerce as to three of those customers. In two of those instances, according to the evidence offered, Commerce reviewed the information submitted and changed its decision, granting the renewal. As to the third, Commerce learned, and informed Calia-nos, that before his complaint to Commerce the customer had obtained a replacement policy from another carrier.
Calianos filed this action on October 20, 2010. He alleges that Commerce amended or terminated the agreement without the requisite notice, and that it declined to renew his customers’ policies, depriving him of commissions.[4] Finally, Calianos asserts that Commerce non-renewed certain policies that he alleges were protected from non-renewal as Clean-in-Three. Commerce moves for summary judgment on all counts of the complaint, and also moves to strike an exhibit, labeled exhibit U, that Calianos offers in support of his opposition to summary judgment.
DISCUSSION
1. The Motion to Strike
As an initial matter, Commerce has moved to strike exhibit U, the affidavit of Jason Calianos, and accompanying exhibits. The exhibits include an Excel spreadsheet which, according to the affidavit, “provides a representative sample of commissions (by year) which I was able to determine that I lost as a result of Commerce’s January 23, 2009 decision to reduce my binding authority under the February 16, 2006 ERP Agreement and as a direct result of the company’s issuance of Notices of Non-Renewal to my customers.” To create the spreadsheet, Calianos “pulled a random sample of Non-Renewals . . . cross referenced [with] the owner and vehicle information . . . from [which] I could tell which clients left my agency and to which companies they went to [sic].” Calianos asserts that from this information he was able to determine that “some of the policies which Commerce Non-Renewed through my agency were later re-written by Commerce through another agent.” Also included in the exhibit are “back up materials which I used to create the representative sample of lost commissions, including Notices of Non-Renewal, Commerce Billing Summary Reports, and 2A forms that I had in my possession
Commerce represents that it made numerous discovery requests for information regarding those policies that. Calianos alleged were improperly non-renewed, but that Calianos failed to produce any such documentation before the close of discovery on September 21, 2011. Commerce served its motion for summary judgment on October 13, 2011. Calianos first disclosed exhibit U to Commerce on November 3, 2011, and served it with his opposition to Commerce’s summary judgment motion on November 4, 2011. Commerce argues that exhibit U should be stricken because its late disclosure violated Rule 26(e).
The Court is inclined to agree with Commerce that Calianos’s delay in disclosing the information provided in exhibit U violates the spirit, if not the letter, of Rule 26(e). Nothing before the Court indicates that Calianos did not have, or could not have obtained, the information he used to prepare exhibit U before discovery closed, or indeed, at the time of his original responses to discovery. Calianos was not entitled to wait until he received Commerce’s motion for summary judgment before gathering and producing the information called for in Commerce’s discovery requests. For reasons that will become apparent, however, the Court concludes that the information in exhibit U, which addresses the issue of damages arising from the alleged breach of contract, does not assist Calianos’s effort to avoid summary judgment. The Court therefore need not rule on Commerce’s motion to strike.
2. The Motion for Summary Judgment.
This Court grants summary judgment where the record establishes that no genuine issues of material fact exist, and that the moving party is entitled to judgment as a matter of law. See Mass.RCiv.P. 56(c); Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1983); Community National Bank v. Dawes, 369 Mass. 550, 553 (1976). “The moving party must establish that there are no genuine issues of material fact, and that the nonmoving party has no reasonable expectation of proving an essential element of its case.” Miller v. Mooney, 431 Mass. 57, 60 (2000). See also Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989). A *319 party moving for summary judgment who does not bear the burden of proof at trial may demonstrate the absence of a triable issue either by submitting affirmative evidence negating an essential element of the nonmoving party’s case, or by showing that the non-moving party has no reasonable expectation of proving an essential element of its case at trial. Flesner v. Technical Communications Corp., 410 Mass. 805, 809 (1991); Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991).
Once the moving party establishes the absence of a triable issue, the party opposing the motion must respond with evidence of specific facts establishing the existence of a genuine dispute. Pederson v. Time, Inc., 404 Mass. at 17. The Court considers the-evidence offered in the light most favorable to the non-moving party; it does not weigh evidence, assess credibility, or find facts. See Dawes, 369 Mass. at 553; Mass.RCiv.P. 56(c); Colley v. Benson, Young & Downs Insurance Agency, Inc., 42 Mass.App.Ct. 527, 528 (1997); see also Kelley v. Rossi, 395 Mass. 659, 663 (1985).
Commerce’s initial argument in support of summary judgment is that the Court should decline to address Calianos’s claims because the Commissioner of Insurance has primary jurisdiction. Under the doctrine of primary jurisdiction, “(i]f an agency has the regulatory power to afford a plaintiff relief, exhaustion of the possibility of remedial agency action should ordinarily precede independent action in the courts.” Columbia Chiropractic Group, Inc. v. Trust Ins. Co., 430 Mass. 60, 62 (1999). The doctrine is inapplicable, however, “when the issue in controversy turns on questions of law which have not been committed to agency discretion.” Casey v. Mass. Electric Co., 392 Mass. 876, 879-80 (1984). Here, on the record presented, the Court concludes that Calianos’s claims present only issues of law. The Court therefore declines to defer to the Commissioner of Insurance.
A. Contract-Based Counts (Counts I, II and V).
To recover on a claim of breach of contract, a plaintiff must show (1) the existence of a contract; (2) the plaintiffs own performance of its material obligations under the contract; (3) the defendant’s breach of a material obligation under the contract; and (4) damages resulting from the breach. See Singarella v. City of Boston, 342 Mass. 385, 387 (1961); Precision Piping Assocs. Inc. v. City of Boston, 3 Mass.App.Ct. 148, 149 (1975); Loranger Constr. Corp. v. E.F. Hauserman Co., 1 Mass.App.Ct. 801 (1973). A covenant of good faith and fair dealing is implied in eveiy contract. Uno Restaurants, Inc. v. Boston Kenmore Realty Corp., 441 Mass. 376, 385 (2004). “The duty of good faith and fair dealing concerns the manner of performance,” id., and provides that “neither party shall do anything that will have the effect of destroying or injuring the right of the other parly to receive the fruits of the contract.” Anthony’s Pier Four, Inc. v. HBC Associates, 411 Mass. 451, 471-72 (1991).
The gist of Calianos’s breach of contract claim is that by sending the January 23, 2009, letter Commerce unilaterally amended the agreement, without giving him the 180 days notice required by the contract. The viability of that claim depends on interpretation of the agreement, in the context of the CAR rules under which the parties entered into it. “The interpretation of [a] contract itself generally presents a question of law for the court. . . Whether or not a contract is ambiguous is also a question of law for the court.” Berkowitz v. President & Fellows of Harvard Coll., 58 Mass.App.Ct. 262, 270 (2003). “The object of the court is to construe the contract as a whole, in a reasonable and practical way, consistent with its language, background, and purpose.” USM Corp. v. Arthur D. Little Sys., Inc., 28 Mass.App.Ct. 108, 116 (1989). “Words that are plain and free from ambiguity must be construed in their usual and ordinary sense.” Citation Ins. Co. v. Gomez, 426 Mass. 379, 381 (1998); Somerset Sav. Bank v. Chicago Title Ins. Co., 420 Mass. 422, 427 (1995).
As quoted supra, the agreement expressly provided that the authority granted to Calíanos was limited to the kinds of insurance for which CAR had appointed Calíanos to Commerce as an ERP, and was subject to, and limited by, CAR’s Rules of Operation, Manual of Administrative Procedures, and bulletins and instructions. On April 1,2009, when MAIP replaced CAR, ERP appointments, including Calianos’s appointment to Commerce, effectively ceased. Thus, the agreement that forms the basis of Calianos’s claim terminated by operation of law on that date.
From that date on, the only avenue by which Calía-nos could have had an appointment with Commerce was by voluntary appointment, which Commerce had no obligation, contractual or otherwise, to grant. Commerce’s January 23,2009, letter notified Calíanos that Commerce would not appoint him voluntarily, and that as a result, under MAIP rules, his authority to bind Commerce had ended, except with respect to renewals of policies that met the definition of Clean-in-Three. The letter did not effect any amendment to the agreement; it simply informed Calíanos of his status under the new system established by law. Commerce is therefore entitled to judgment as a matter of law on the contract claims, counts I and II.
Count V, claiming breach of the covenant of good faith and fair dealing, rests on the same factual allegations as the breach of contract claims, and fails for the same reasons. Calíanos argues, in substance, that Commerce acted in bad faith when it did not renew his policies on a voluntary basis. The flaw in this theory is that nothing in the contract required Commerce to do so, nor does any evidence indicate that Commerce ever entered into any voluntary relationship with Calíanos. To the contrary, it is undisputed that the contractual relationship on which Calíanos relies arose entirely from his appointment to Commerce as *320 an ERP under the CAR rules in effect at the time. Once MAIP replaced CAR, Commerce had no obligation to Calianos beyond the renewal of the Clean-in-Three policies. See Report to the Joint Committee on Financial Services of Effort Made to Facilitate the Transition of Exclusive Representative Producers to Voluntary Agents, Massachusetts Division of Insurance, July 13, 2009 (agents have no guaranteed right to contracts since insurers can choose not to extend voluntary contracts to ERPs). The Court therefore concludes that Commerce is entitled to judgment as a matter of law on count V.
B. Intentional Interference with Advantageous Relations (Count VI)
To prevail on a claim of intentional interference, a plaintiff must prove that “(1) he had an advantageous relationship with a third parly (e.g., a present or prospective contract or employment relationship); (2) the defendant knowingly induced a breaking of the relationship; (3) the defendant’s interference with the relationship, in addition to being intentional, was improper in motive or means; and (4) the plaintiff was harmed by the defendant’s actions.” Blackstone v. Cashman, 448 Mass. 255, 260 (2007), citing Weber v. Community Teamwork, Inc., 434 Mass. 761, 781 (2001).
The factual basis for Calianos’s claim of intentional interference is less than clear in the complaint. From Calianos’s memorandum, the Court understands the primary theory to be that Commerce interfered with Calianos’s relationship with his customers by informing them that Calianos could not renew their policies with Commerce, in violation of what Calianos contends was Commerce’s contractual obligation to allow him to do so.
The fundamental flaw in this theory is that, as the Court has ruled with respect to the contract-based counts, Commerce had no such contractual duly, except with respect to policies that met the definition of Clean-in-Three. As to those, although there is evidence of some initial errors in application of the definition, the record identifies no instance of a qualified customer of Calianos whose policy Commerce did not ultimately agree to renew. Without evidence to identify any such customers, Calianos cannot show that he has been harmed by any conduct of Commerce that might have violated its obligations; the general assertion that Commerce failed to renew other Clean-in-Three policies is insufficient to defeat summary judgment. See, e.g., Lalonde v. Eissner, 405 Mass. 207, 209 (1989) (unsupported assertions and conclus-oiy statements “unacceptable to defeat summary judgment”). Commerce is therefore entitled to judgment as a matter of law on count III.
C. Violation of G.L.c. 93A (Counts III and IV).
The claims under c. 93A, counts III and IV, rest on the same conduct that forms the basis of the other claims. For the reasons already discussed, the evidence offered does not support those claims. Commerce is therefore entitled to judgment as a matter of law on the c. 93A counts as well.
CONCLUSION AND ORDER
For the reasons stated, Defendant Commerce Insurance Company’s Motion for Summary Judgment is ALLOWED. The Court takes no action on Commerce’s Emergency Motion to Strike Exhibit U from the Summary Judgment Appendix.

CAR was created by G.L.c. 175, §113H and operates under its own plan and rules of operation.

The governing committee responsible for effecting the transition to MAIP, and proposing its rules, continues to be known as CAR. Rules 21-40 of the CAR Rules of Operation govern MAIP, and are known as the MAIP Rules. See Arbella Mut. Ins. Co. v. Commissioner of Ins., 456 Mass. 66, 69 n.6 (2010).

fyhe problem apparently related to treatment of policies involving household members other than the named insured who did not meet the definition of clean in three, but who were “deferred,” meaning that they had their own policies, or “excluded,” meaning that they did not drive the vehicle.

'he complaint asserts claims for breach of contract (counts I and II); violation of G.L.c. 93A (counts III and IV); breach of the covenant of good faith and fair dealing (count V); and intentional interference with advantageous relations (count VI).