Kirpalani, Maynard M., J.
INTRODUCTION
This action arises out of an alleged breach of contract based on ACT Electronics’ (“ACT”) failure to pay sales commissions to Estream Solutions, LLC (“Estream”) and to Supply Chain Associates, LLC (“Supply Chain”), respectively. In June 2008, Estream and Supply Chain (collectively, “Plaintiffs”) filed an action to recover the unpaid sales commissions. The Plaintiffs subsequently amended their complaint three times. On September 20, 2010, the Plaintiffs filed their fourth amended complaint; the defendants named in that complaint were: Sun Act, LLC (“Sun Act”), Sun Capital Partners II, LP (“Fund II”), Sun Capital Advisors II, LP (“SCAII”), Sun Capital Partners, LLC (“SCP, LLC”), Sun Capital Partners, Inc. (“Sun Capital”), Sun Capital Advisors, Inc. (“Sun Advisors”), Sun Capital Partners Management, LLC (“Sun Management”) (collectively, “Defendants”) and ACT Electronics, Inc. (“ACT’).[3] The fourth amended complaint alleges that the Defendants are liable to Plaintiffs both at law and in equity for ACTs breaches of contract (Counts I, II, III, V, VI, VII, X); that the Defendants violated M.G.L.c. 93A, § 11 when they engaged in unfair and deceptive practices (Count IX); and that Defendants intentionally interfered with Plaintiff and ACT’S contracts (Counts XII, XIII).
This matter is before the court on the Defendants’ motion to strike statements from the summary judgment record and on the Sun Defendants’ motion for summary judgment. After hearing and review of the parties’ submissions and the relevant law, the Sun Defendants’ motions are ALLOWED.
FACTS
ACT, a Delaware corporation specializing in manufacturing electronic devices and components, was incorporated on June 24, 2002. From its incorporation in 2002 to its bankruptcy in 2008, ACT employed approximately four-hundred full-time and part-time employees who worked at one of its three manufacturing facilities.
Sun Act is a limited liability company, and, during ACT’s existence, was ACTs majority shareholder and held 70% of ACTs stock. It also held the only voting shares of ACT.
Fund II, a Delaware limited partnership, is an investment firm that wholly-owns Sun Act. Fund II’s *13 limited partners include approximately seventy private and public investors, including fund-of-funds investors, university endowments, pension funds, financial institutions, trusts and individuals. Fund II provided Sun Act with capital to invest and obtain a majority shareholder interest in ACT.
SCA II is the general partner of Fund II.
SCP, LLC is the general partner of SCA II.
Sun Capital, a Florida corporation, is also a private investment firm. Entities affiliated with Sun Capital raise funds to invest in underperforming or financially distressed companies. The Plaintiffs allege that Sun Capital is the defacto parent company of all the other Defendants. The Defendants counter that there is no direct or indirect ownership or contractual relationship between Sun Capital and any other Defendant, or between Sun Capital and ACT.
ACT Manufacturing (“Manufacturing”), ACTs predecessor, was a Massachusetts corporation that provided electronics manufacturing services to equipment manufacturers. On December 21, 2001, Manufacturing filed for bankruptcy. On June 14, 2002, the Bankruptcy Court entered an Order Approving Bidding Procedures by which Manufacturing could sell certain of its assets and assume and assign certain executory contracts and unexpired leases. On July 2, 2002, Manufacturing entered into an Asset Purchase Agreement with ACT.
The Asset Purchase Agreement called for ACT to purchase Manufacturing for approximately $6 million. Harris Trust & Savings Bank provided ACT with a senior bridge loan of $3.2 million to help finance the purchase. ACT also executed two promissory notes to finance the purchase. ACT was maker of both notes, the first note was held by Sun Act for $2.97 million and the second note was held by Randolph Street Partners IV for $30,000. According to the record, it is unclear where the remainder of the capital came from, although both parties agree that the purchase was financed with both equity and debt. It is also undisputed that, after payment of the purchase price and closing expenses, ACT retained approximately $1 million of available capital. Pursuant to the Agreement, ACT also immediately acquired more than $10 million in accounts receivable and inventory.
On August 15, 2002, ACT entered into a Loan and Security Agreement with Congress Financial Corporation (“Congress Financial”), which eliminated the $3.2 million bridge loan. Pursuant to the Loan and Security Agreement, ACT could borrow amounts not to exceed $14 million. ACTs Loan and Security Agreement with Congress Financial remained in place through 2008, and was amended from time to time in order to increase the maximum credit, first to $17 million, and, later, to $23 million.
After ACT purchased Manufacturing’s assets, ACT began to generate cash revenue. ACT collected accounts receivable from Manufacturing customers; ACT sold Manufacturing’s excess inventory; ACT sent inventory to customers that it had acquired from the Manufacturing purchase agreement; ACT renegotiated equipment leases that were rejected in Manufacturing’s bankruptcy proceedings and not assumed by ACT; ACT closed Manufacturing’s six manufacturing facilities and transferred its related production to another facility; and ACT established favorable credit terms with ACTs major vendors. As a result of this, ACT realized significant cash flow and working capital.
Sun Management, a Delaware limited liability company, provides consulting services to companies. On July 2, 2002, Sun Management and ACT entered into a Management Services Agreement (“MSA”) in which Sun Management, referred to as, “the Manager,” in the MSA, would provide services to ACT’s senior corporate management in exchange for an annual fee equal to the greater of: (i) $300,000.00; or (ii) 8% of the ACTs EBITDA,[4] payable in quarterly installments, plus out-of-pocket fees and expenses, and a one-time investment banking fee in the amount of $66,000.00. Between 2002 and 2008, ACT paid Sun Management fees and reimbursements totaling more than $2 million.
Steven Liff (“Liff j, then-Vice President of Sun Management, executed the MSA on behalf of Sun Management. Liff, then-Vice President of ACT, also executed the MSA on ACTs behalf. At that time, Liff was also working as an employee of Sun Advisors. ACT’s independent lender, Congress Financial, was aware of, and approved, the MSA.
Sun Act, Fund II, SCA II, SCP, LLC, Sun Capital, and Sun Management do not have employees.
Sun Advisors is a Florida corporation that also provides consulting and advisory services to companies. Sun Advisors entered into a Mastery Advisory Agreement with Sun Management, contracting to provide its services to various companies, including ACT. Sun Management required its portfolio companies to file monthly financial reports. The MSA did not specifically require ACT to make weekly or monthly financial reports, but ACT did submit weekly “flash reports” as well as a standardized 19-page financial report every month.
On January 22, 2003, the Board of Directors Meeting Minutes reveal that Pino, Sr., then an ACT director, and Joseph Driscoll, then an ACT officer, listed their addresses as 5200 Town Center Circle, Suite 470, Boca Raton, Florida. The principal office of every named Defendant is located at 5200 Town Center Circle, Boca Raton, Florida. At all other relevant times, ACT and its Board have listed their business addresses in Hudson, Massachusetts.
ACT maintained a separate headquarters, separate minute books, accounting records, bank accounts, *14 and budgets from all Defendants. ACT also filed its own tax returns, made routine filings with the appropriate offices of the Secretaries of State, and held routine Board of Directors’ meetings.
During its first year of existence, ACT repaid its third-party debt. In early 2003, ACTs Board of Directors also voted to repay all subordinated promissory notes outstanding to ACT’s investors in the aggregate principal amount of approximately $3 million, plus applicable accrued interest. Congress Financial approved ACTs repayment of the subordinated debt.
Plaintiff Estream, a Connecticut Limited Liability Company, served as a manufacturer’s representative, brokering the sale of electronic products. Edward Duffy (“Duffy”) was the managing member of Estream from 2003 until its dissolution in 2005. On January 14, 2003, Estream entered into a Sales Representative Agreement (“Estream Agreement") with ACT, which provided that Estream would receive commissions on sales to certain customers. The calculation for determining these commissions would be based on a specified percentage of the gross profit that ACT earned on the sale.
At some point, ACT’s vendors expressed to Duffy that ACT repeatedly failed to pay the vendors in a timely manner, and the vendors required cash on delivery (“C.O.D.”) payments.
Bloomberg, LP (“Bloomberg”) is a Delaware limited partnership with a principal office located in New York, New York.
In early 2003, Duffy held three conference calls with Bloomberg representatives, with ACT’s Pino, Sr.[5] and John M. Pino, Jr. (“Pino, Jr.”),[6] and with Kevin J. Calhoun (“Calhoun”), Sun Capital’s Vice President. The purpose of the calls was for ACT to secure Bloomberg’s business. ACT and Sun Capital’s representatives also sought to assuage Bloomberg’s concerns with respect to ACTs financial stability, its belief that ACT was undercapitalized, and ACT’s predecessor’s bankruptcy history. Following these conversations, Bloomberg sent ACT a Request for Proposal. After ACT responded to this Request, Bloomberg representatives continued to express concern to Duffy about ACT’s financial situation. Duffy shared Bloomberg’s concerns with ACT and with Sun Capital.
On March 5, 2003, Pino, Sr. sent a letter to Bloomberg’s Efrat Yacobi (“Yacobi”) on ACT letterhead, stating that ACT was “supported by a strong financial partner.” It appears that the “partner” to which Pino, Sr. referred was Sun Capital. On March 6, 2003, Calhoun, on Sun Capital letterhead, also sent a letter to Yacobi. In that letter, Calhoun wrote of assisting Bloomberg with its due diligence of ACT. In that letter, Calhoun states that Sun Capital “holds the investment in ACT’ and that “Sun Capital can invest approximately $40 million... in any one transaction through [Fund II] . . .”
Despite Calhoun’s assurances, Bloomberg insisted that Sun Capital issue a Letter of Guarantee for ACT. On or about July 3, 2003, Sun Capital entered into a Letter of Guarantee which provided that, upon ACTs insolvency, Sun Capital would provide ACT with the financing required to manufacture and deliver a certain number of finished goods to Bloomberg. The Letter of Guaranty expressly provides that it would not be construed to provide any rights to any entity other than Fund II or Bloomberg, including rights as a third-party beneficiary.
On or about July 3, 2003, ACT and Bloomberg entered into an Agreement for the Manufacture and Supply of Goods (“Bloomberg Agreement”). In that contract, Bloomberg agreed to buy certain electronic goods from ACT; in exchange, ACT was required to assemble and supply the electronic goods and to maintain one month’s “buffer inventory” of the products it sold to Bloomberg. All shipments of products from ACT to Bloomberg were made to New York or outside the United States.
Between August 2004 through March 2006, ACT reduced Estream’s commission payment percentage from 5% to 4%. Between 2003 and 2005, ACT failed to report and/or to pay Estream commissions on its sales to Bloomberg. On September 30, 2004, ACT terminated the Estream Agreement. Estream was dissolved in 2005.
Plaintiff Supply Chain Associates, LLC (“Supply Chain”), is a Connecticut Limited Liability Company with its principal place of business in Connecticut. Supply Chain, like Estream, serves as a manufacturer’s representative and brokers the sale of electronic products. Since 2005, Duffy has served as the President of Supply Chain. On April 11, 2006, ACT entered into a Sales Representative Agreement with Supply Chain, the terms of which were substantially similar to those of the Estream Contract, including, but not limited to, the fluctuating commission rate. On May 1, 2006, the parties amended the Agreement, and authorized Supply Chain to solicit orders from Bloomberg. All orders that ACT shipped to Bloomberg pursuant to the Agreement were made to New York or to outside the United States.
Sometime between March and June 2007, Bloomberg exercised its rights under the Bloomberg Agreement to demand Act’s buffer inventory. ACT did not have the required quantities of buffer inventory and was therefore in breach of the Bloomberg Agreement. On October 3, 2007, ACT received a notice from Bloomberg cancelling the Bloomberg Agreement.
Plaintiffs claim that from May 2006 through April 2008, ACT paid Supply Chain a commission for its sales to Bloomberg and other companies based on a 4% commission rate, rather than a 5% commission rate. In addition, between March 2006 through February 2008, there were many instances in which *15 Supply Chain solicited business for ACT, but ACT failed to pay Supply Chain for its services.
Sometime between September 3, 2007 and October 29, 2007, Pino, Jr. orally told Duffy that Sun Capital had ordered ACT not to pay any commissions to Estream or to Supply Chain until the lawsuit between Duffy and his Estream partners David and Richard Harrington (“the Harrington lawsuit”) was resolved. On October 29, 2007, in an email, Pino, Jr. wrote to Duffy: “This is going to get ugly . . . apparently Harrington attorney promised our guy that he wouldn’t proceed without speaking to him . . . and then he did . . . Now Sun Capital is involved and they are now picking on the Gross Profit calculation . . . buckle up ... I can feel this getting ugly fast.” Following this e-mail, Pino, Jr., on more than one occasion, told Duffy that Sun Capital had instructed ACT not to pay any commissions owed to Estream or to Supply Chain.
On February 8, 2008, Duffy settled the Harrington lawsuit. Following the settlement, Duffy, believing that Sun Capital would now allow ACT to pay the overdue commissions, contacted Pino, Jr. and reported that he had settled the suit. Pino, Jr. told Duffy that he would report the matter to Pino, Sr., then the CEO of ACT. Pino, Jr. told Duffy that his father, Pino, Sr. would then inform ACTs Board of Directors.
In an e-mail exchange on March 17 and 18, 2008, Pino, Jr. again acknowledged that ACT owed unpaid commissions to Supply Chain and Estream and promised to institute a payment plan through which ACT could come current on those unpaid commissions. At some point thereafter, Pino Jr.’s position changed, and in an email dated March 26, 2008, Pino, Jr. informed Duffy that “(m]y initial discussions have not been positive. I sat with the team earlier today and based on the most recent Gross Margin calculations it is their belief that we have paid more than we should have based on the contract and we shouldn’t pay anything further. . .”
ACT’s Board of Directors who served between October 29, 2007 through March 26, 2008 were Terry, Rick Walter (“Walter”), and Pino, Sr. The parties agree that at that time, Terry and Walter “were employees of Sun Capital, or one of its related entities.”
During the same period, Pino, Sr. served as ACTs President, Chief Executive Officer, Chief Financial Officer, Treasurer and Secretary and Pino, Jr. served as one of ACTs many Vice Presidents.
In the fall of 2008, ACT’s Chief Financial Officer, Peter Zarella, discovered that, based on an accounting error, ACT was overextended and in default on its line of credit with Wachovia. At that time, ACT had approximately $12 million outstanding on its line of credit with Wachovia, and if the loan were called, it would cause serious liquidity issues for ACT. On November 13, 2008, ACT’s Board of Directors voted to file for bankruptcy.
On September 20, 2010, Plaintiffs filed their fourth amended complaint against Defendants. The allegations fall into three general categories: first, that the Defendants abused ACTs corporate form and are therefore liable to plaintiffs at law and in equity; second that Defendants violated M.G.L.c. 93A, §11 when they engaged in unfair and deceptive practices with Plaintiffs; third, that Defendants interfered with Estream and Supply Chain’s contractual relationships with ACT.
Defendants now file amotion to strike certain statements from the summary judgment record and a motion for summary judgment arguing that, as a matter of law, the Defendants are not liable, through a veil-piercing theory or otherwise, for any of ACTs conduct during ACTs existence, nor did they interfere with Plaintiffs’ contractual relationships with ACT.
DISCUSSION
I. Standard of Review
Summary judgment is appropriate where there is “no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law.” Mass.R.Civ.P. 56(c). “The party moving for summary judgment assumes the burden of affirmatively demonstrating that there is no genuine issue of material fact on every relevant issue, even if he would have no burden on an issue if the case were to go to trial.” Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989). “This burden [may be] met by affirmative evidence negating an essential element of the plaintiffs case, but may [also] be satisfied by demonstrating that proof of that element is unlikely to be forthcoming at trial.” Flesner v. Technical Comm’ns Corp., 410 Mass. 805, 809 (1991). “If the moving party establishes the absence of a triable issue, the party opposing the motion must respond and allege specific facts which would establish the existence of a genuine issue of material fact in order to defeat a motion for summary judgment.” Pederson, 404 Mass. at 17.
“When a motion for summary judgment is made and supported ... an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.” Mass.R.Civ.R. 56(c). When deciding a motion for summary judgment, the court views the evidence in the light most favorable to the non-moving party, but does not weigh evidence, assess credibility, or find facts. Attorney General v. Bailey, 386 Mass. 367, 370-71 (1982). All reasonable inferences are to be viewed “in favor of the non-moving party.” Terra Nova Ins. Co. v. Fray-Witzer, 449 Mass. 406, 411 (2007); see Bailey, 386 Mass. at 370, quoting Hayden v. First Nat’l Bank, 596 F.2d 994, 997 (5th Cir. 1979) (“A court should not grant a party’s motion for summary judgment ‘merely because the facts [the moving party] offers appear more plausible than those *16 tendered in opposition, or because it appears that the adversary is unlikely to prevail at trial’ ”).
“Supporting and opposing affidavits shall be made on personal knowledge [and] shall set forth such facts as would be admissible in evidence ...” Mass.R.Civ.P. 56(e). “Hearsay in an affidavit is unacceptable to defeat summaiy judgment.” Madsen v. Erwin, 395 Mass. 715, 721 (1985).
II. Motion to Strike Hearsay Statements
Defendants move to strike certain statements from the summaiy judgment record, claiming that those statements are inadmissible hearsay.[7]
A. Pino, Jr.’s Statements to Duffy
Plaintiffs contend that Pino, Jr.’s statements made in e-mails to, and in oral conversations with, Duffy are not offered to prove the truth of the matter asserted, but merely offered to prove that ACT had no authority to pay, or not to pay, on its own. These statements are irrelevant, however, unless there is evidence that one or all of the Sun Defendants ordered ACT not to pay. The statements must be excluded from the summaiy judgment record, then, unless a hearsay exception applies.
The only potentially applicable hearsay exception here would be the vicarious admission exception, as defined by Proposed Massachusetts Rules Evidence 801(3) (2) (D) and adopted by the Supreme Judicial Court in Ruszcyk v. Secretary of Pub. Safety, 401 Mass. 418, 420 (1988). Proposed Rule 801(d)(2)(D) provides that a statement “offered against a party [is] not excluded by the hearsay rule” if that statement is: “[a] statement by a party’s agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship.”
Massachusetts uses a two-part test to determine the admissibility of a vicarious admission. Herson v. New Boston Garden Corp., 40 Mass.App.Ct. 779, 791 (1996). “First, was the declarant. . . authorized to act on the matters about which he spoke?” Id. “If yes, . . . [was] the probative value of the evidence substantially outweighed by its potential for unfair prejudice, under proposed Mass R.Evid. 403.” Id., citing Ruszcyk, 401 Mass. at 422.
Turning to the first part of the test, a declarant will be authorized to act on matters on which he speaks when an agency relationship exists. “An agency relationship is created when there is mutual consent, express or implied, that the agent is to act on behalf and for the benefit of the principal, and subject to the principal’s control (citations omitted).” Theos & Sons, Inc. v. Mack Trucks, Inc., 431 Mass. 736, 742 (2000). “Even where an agent-principal relationship exists, however, the principal has liability for the agent’s acts toward third parties only if the agent was acting with the actual or apparent authority of the principal in that transaction.” Id. at 743. Pino, Jr.’s statements on behalf of ACT will be attributed to one (or more) of the Defendants as a vicarious admission if one (more) of the Defendants authorized Pino, Jr., either actually or apparently, to speak on their behalf. This authorization must be shown through words or conduct made outside of the proposed extrajudicial statements; in other words, the extrajudicial statements cannot be used to prove the agency. See Herson, 40 Mass.App.Ct at 791.
“Actual authority, either express or implied, is the agent’s power to affect the principal’s relations with third parties as manifested to the agent by the principal (citations omitted).” Theos & Sons, Inc., 431 Mass. at 743-44 (2000). “Apparent authority! ] is ‘created as to a third person by written or spoken words or any other conduct of the principal which, reasonably interpreted, causes the third person to believe that the principal consents to have the act done on his behalf by the person purporting to act for him.’ ” Id. at 745, quoting Restatement (Second) of Agency §27 (1958). “Apparent authority exists only if the plaintiff reasonably relied on the principal’s words or conduct at the time he entered the transaction that the agent is authorized to act on the principal’s behalf.” Id., citing Todd Farm Corp. v. Navistar Int’l Corp., 835 F.2d 1253, 1256 (8th Cir. 1987) (no apparent authority of equipment dealer to act for manufacturer where no evidence plaintiff aware of manufacturer’s statements when plaintiff bought equipment nor reasonably relied on manufacturer’s reputation when it did business with dealer).
In this case, Pino, Jr.’s statements cannot be used to prove the agency. Therefore, there is no evidence on the summaiy judgment record, outside of Pino, Jr.’s statements, to suggest that any of the Defendants granted Pino, Jr. or ACT the actual authority to speak on their behalf. There is also no evidence to suggest that Defendants cloaked ACT with apparent authority; at the time the Plaintiffs entered into their respective agreements with ACT, the Plaintiffs did not reasonably rely on the Defendants’ words or conduct that ACT was the agent of the Defendants. Since ACT was not serving as agent for any of the Defendants, the hearsay statements must be stricken from the record.
B. Bloomberg Representatives’ and ACTs Vendors’ Statements to Duffy
Bloomberg representatives’ statements to Duffy regarding ACT’s history of bankruptcy, under-capitalization, and financial stability, the representatives’ demand for ACT to keep buffer inventory, as well as vendors’ statements to Duffy that the vendors required ACT to make C.O.D.s over concern for ACT’s financial stability, are all out-of-court statements offered to prove the truth of the matter asserted. Plaintiffs claim that the statements are admissible to show Bloomberg representatives’ and the vendors’ states of mind (i.e. apprehension or uncertainty about ACTs financial stability); to use the statements for that purpose, however, would render the statements irrelevant. The *17 statements must therefore be stricken from the record.
III. Motion for Summary Judgment
A. Claims Involving Piercing the Corporate Veil (Counts I, II, III, V, VI, VII)
“(C)orporations are generally to be regarded as separate from each other and from their respective stockholders . . . where there is no occasion [ ]to look beyond the corporate form for the purpose of defeating fraud or wrong, or for the remedying of injuries . . . (citations omitted).” My Bread Baking Co. v. Cumberland Farms, Inc., 353 Mass. 614, 618 (1968). “(C]orporate veils are pierced only in ‘rare particular situations’. . . (citations omitted).” Scott v. NG U.S. 1, Inc., 450 Mass. 760, 767 (2008). “A corporation or other person controlling a corporation and directing, or participating actively in . . . its operations may become subject to civil or criminal liability on principles of agency or of causation (citations omitted).” Id. To succeed in its motion for summary judgment, the Defendants have the burden of showing that, as a matter of law, Plaintiffs cannot pierce the corporate veil.
1. Jurisdiction in Veil Piercing Cases
“The local law of the state of incorporation will be applied to determine the existence and extent of a shareholder’s liability to the corporation for assessments or contributions and to its creditors for corporate debts.” Lily Transp. Corp. v. Royal Inst Servs., Inc., 64 Mass.App.Ct. 179, 188 n.15 (2005), quoting Restatement (Second) Conflict of Laws §307 (1971). However, where the place of contracting, the place of contract negotiation, the place of performance, and the location of the contract subject matter were in Massachusetts, the Appeals Court has applied Massachusetts law. See Evans v. Multicon Const. Corp., 30 Mass.App.Ct. 728, 737 n.7 (1991) (applying Massachusetts law where alleged shell company was incorporated in Ohio and companies to be pierced were incorporated in Ohio).
In this case, where ACTs principal place of business was in Massachusetts; where the Supply Chain Agreement and the Estream Agreements were both governed by Massachusetts law;[8] and where ACTs products were manufactured in Massachusetts and the shipments of those products originated in Massachusetts, this court will apply Massachusetts law.[9]
2. Piercing the Corporate Veil
In Evans, the Appeals Court, citing Pepsi-Cola Metro. Bottling Co., Inc. v. Checkers, Inc., 754 F.2d 10, 16 (1st Cir. 1985), held that there were twelve factors to consider in deciding whether to pierce the corporate veil:
(1) common ownership; (2) pervasive control; (3) confused intermingling of business activity assets, or management; (4) thin capitalization; (5) nonobservance of corporate formalities; (6) absence of corporate records; (7) no payment of dividends; (8) insolvency at the time of the litigated transaction; (9) siphoning away of corporate assets by the dominant shareholders; (10) non[-]functioning of officers and directors; (11) use of the corporation for transactions of the dominant shareholders; (12) use of the corporation in promoting fraud.
30 Mass.App.Ct. at 732-33.
Each of these factors will be considered in turn.
(a) Common Ownership
In a veil-piercing case, courts first consider “whether a corporation is operated as a separate entity.” InterGen N.V. v. Grina, 344 F.3d 134, 149 (1st Cir. 2003); see also Evans, 30 Mass.App. at 733. The corporation is not operated as a separate entity “ [wjhere there is common control of a group of separate corporations engaged in a single enterprise . . .” My Bread Baking Co., 353 Mass. at 619 (1968). Yet, “common ownership of stock of two or more corporations together with common management, standing alone, will not give rise to liability on the part of one corporation for the acts of another corporation or its employees ...” Id.
It appears that Defendants had some “common control” of ACT. For example, Sun Act owned 70% of ACT’s shares. See Evans, 30 Mass.App.Ct. at 733. Yet, Sun Act was not in complete control of ACT; it still had a fiduciary duty to the nonvoting stockholders who held 30% of the shares. ACT had to “deliver value” to the buyers for which it manufactured products. See id. In addition, Congress Financial, ACTs independent lender, approved ACTs dividend declaration. This suggests the entity that shared “common control” of ACT “operated at arm’s length” with ACT. See id.
Plaintiffs allege there was common control of ACT because some of the same people who served on ACTs Board were “employed by Sun Capital or one of its related entities”; of particular importance to the Plaintiffs is that when Pino, Jr. informed Duffy that ACT would not pay the commissions, Terry and Walter were Directors of ACT. Terry and Walter were also “employees of Sun Capital or one of its related entities.” Since the parties agree that Sun Act, Fund II, SCA II, SCP, LLC, Sun Capital, and Sun Management do not have employees, the only “Sun Capital entity” that could have “employed” Terry and Walter at that time was Sim Advisors. Directors and officers, not employees, control companies. Terry and Walter, as Sun Advisor employees, could not have controlled Sun Advisors and there was thus no common control between Sun Advisors and ACT when ACT refused to pay the commissions.
(b) Pervasive Control
A court will find that a corporation has been pervasively controlled when one corporation is carrying out tasks pursuant to another corporation’s command, or when one corporation seeks permission from another *18 before taking action on its own behalf. Lee v. Int’l Data Group, 55 Mass.App.Ct. 110, 116 n.7 (2002). Courts consider whether the controlled corporation had a “separate mind, will or existence of its own (citations omitted).” Scott, 450 Mass. at 770-71.
There is also no evidence that Defendants ran ACT “as [its] own candy store.” See id. ACT maintained its own headquarters, minute books, accounting records, bank accounts and budgets separate from Defendants. It also filed its own tax returns. There is evidence that at one point, on January 22, 2003, Pino, Sr. and Driscoll listed their addresses in Florida at the same business address as the Defendants. Other than this one incident in 2003, ACT and its Board members listed their addresses in Hudson, Massachusetts where ACT was located. In addition, the MSA does not show that Sun Management pervasively controlled ACT. While Liff might have been on both sides of the MSA, this was a conventional management sales agreement, and was approved by Congress Financial, an independent third-party lender.
(c)Confused Intermingling of Business Activity Assets, or Management
With respect to this factor, courts consider whether a business was “clearly defined” or whether there is “a confused intermin[gling] of activity of two or more corporations engaged in a common enterprise with substantial disregard of the separate nature of the corporate entities . . .” My Bread Baking Co., 353 Mass. at 619; see e.g. George Hyman Const. Co. v. Gateman, 16 F.Sup.2d 129, 151 (1stCir. 1998) (company engaged in confused intermingling where used letterhead of one corporation in correspondence involving activity of another corporation and where vendors were confused about which company they were dealing with). ACT maintained separate headquarters, minute books, accounting records, bank accounts and budgets from Defendants, and ACT also filed its own tax returns. It is true that on January 22, 2003, ACTs Board Meeting Minutes reveal that Pino, Sr. and Driscoll listed their addresses in Florida, at the same business address as the Defendants. Plaintiffs do not claim that they, or vendors, were ever confused about with whom they were dealing when they contracted with ACT. In fact, Sun Capital used Sun Capital letterhead in its dealings with Bloomberg. ACT used its own letterhead in its dealings with Bloomberg. Bloomberg also demanded buffer inventory from ACT; this shows Bloomberg understood that ACT, and not Sun Capital, would be held liable for ACTs actions if it breached the contract with Bloomberg.
(d)Thin Capitalization
This factor focuses on whether the initial capitalization of the company “was too thin.” Evans, 30 Mass.App.Ct. at 734. The Court considers the initial needs of the company, whether the company was given “the up-front financing needed” to perform its work, and whether, “[d]uring its active corporate life,” the company “want[ed] for assets.” Id.
In this case, ACT was initially capitalized with over $7 million in equity and debt. ACT operated for six years after its initial capitalization, employing four-hundred full-time and part-time employees working at one of its three different manufacturing facilities. These factors tend to show that, based on the needs of the company, the initial capitalization was sufficient. Evans, 30 Mass.App.Ct. at 734 ($500.00 was “unquestionably thin” but it was not “too thin” based on the needs of the company); George Hyman Constr. Co., 16 F.Sup.2d at 153 ($28,000.00 capitalization in loan “was thin, but not anorexic” and was “not indicative of a company set up for financial failure”).
(e)Nonobservance of Corporate Formalities
ACT took care to observe the corporate formalities. See Evans, 30 Mass.App.Ct. at 734. Separate tax returns were “meticulously filed.” See id. In addition, throughout its years of activity in Massachusetts, ACT made “routine filings with the Secretary of the Commonwealth.” See id.
(f)Absence of Corporate Records
ACT maintained its own corporate records, separate and apart from any of the Defendants’ corporate records. Nothing in the record suggests that ACTs corporate records were ever either “missing or fudged.” See id.
(g) No Payment of Dividends
“[C]orporations in the normal course should be paying dividends, or at a minimum making conscious decisions not to do so.” George Hyman Constr. Co., 15 F.Sup.2d. at 154. This factor is “a telltale [sign] that [the corporation] was a dummy corporation whose veil ought to be pierced." Evans, 30 Mass.App.Ct. at 735. In this case, ACT declared a dividend to its shareholders, which resulted in Sun ACTs acquiring $1.86 million and ACTs other non-Defendant shareholders acquiring $1.14 million. There is nothing unusual about the payment of dividends, especially where, as here, ACT retained in excess of $1 million in cash, in addition to lines of credit, accounts receivable, and inventory. In addition, Congress Financial, ACTs independent lender, approved this distribution.
(h) Insolvency at the Time of the Litigated Transaction
The test for insolvency is whether the corporation, “at any time while it was active, experienced difficulty in paying debts as they became due ...” See Evans, 30 MassApp.Ct. at 735. “The ‘time’ considered for the test of insolvency is not a single point in time but rather the duration of the contested transactions between the parties.” George Hyman Constr. Co., 15 F.Sup.2d. at 154, citing Evans, 30 Mass.App.Ct. at 735. In this case, the time period considered for this factor begins on January 14, 2003, when Supply Chain entered into a Sales Representative Agreement with ACT. During ACTs first year of existence, (June 24,2002-June 24, 2003), ACT repaid all subordinated promissory notes outstanding to ACTs investors in the *19 amount of $3 million plus accrued interest. Congress Financial approved ACTs repayment of these loans. There is no evidence on the record, other than the extrajudicial statements Bloomberg and the ACTs vendors made to Duffy, that ACT experienced difficulty in paying debts as they became due.
(i)Siphoning Away of Corporate Assets by the Dominant Shareholders
To show that there was siphoning away of corporate assets, there must be “credible evidence of subterfuge or channeling excessive payments . ..” Birbara v. Lock, 99 F.3d 1233, 1241 n.8 (1st Cir. 1996). This can be shown through, for example, payments or dividends to officers, directors or stockholders or the Internal Revenue Service challenging payments to officers or directors. Evans, 30 Mass.App.Ct. at 735-36.
Here, it is undisputed that, after the dividend payment, ACT retained in excess of $1 million in cash in addition to lines of credit, accounts receivable, and inventory, and that Congress Financial, ACTs independent lender, was aware of, and approved, ACTs dividend payment. In addition, it is undisputed that the payment of management fees made pursuant to the MSA were also approved by Congress Financial, and that these iypes of agreements are common in the private equity industry. The IRS never challenged any of these payments.
(j) Non-functioning of Officers and Directors
This factor asks the court to consider whether the officers and directors functioned “actively.” Evans, 30 Mass.App.Ct. at 736. There is nothing in the summary judgment record to support that ACTs officers and directors were non-functioning.
(k) Use of the Corporation for Transactions of the Dominant Shareholders
The test here is whether the Defendants “used the corporation in aid of transactions in which they had substantial interest.” See Evans, 30 Mass.App.Ct. at 736. ACTs one and only dividend distribution was recorded in the corporate records. See George Hyman Constr. Co., 16 F.Sup.2d at 157. The other transaction that Plaintiffs consider to be evidence of abuse of the corporate form, was the payment of management fees. These fees are not “extravagant beyond any reasonable business usage,” and, indeed, were approved by Congress Financial, ACTs third-party lender. Contra, id. at 157 (transaction extravagant where shareholders purchased Ferrari and Mercedes for their own use through corporation).
(1)Use of the Corporation in Promoting Fraud
Finally, the court considers whether there is any basis upon which to conclude that the corporation was used to perpetrate a fraud. See Evans, 30 Mass.App.Ct. at 736. There is no such basis here. “The record contains no evidence warranting a finding that [ACT] was established or operated so as to misrepresent or divert assets.” Id. Based on the facts that in the six years that it operated, ACT employed four-hundred full-time and part-time employees located at one of its three manufacturing facilities, and that ACT delivered value to its customers, suggest that ACT was established to manufacture products, not to swindle sales representatives, like Plaintiffs, out of money.
When determining whether to pierce the corporate veil “]o]ne examines the twelve factors to form an opinion whether the over-all structure and operation misleads.” Id. “There is present in the cases which have looked through the corporate form an element of dubious manipulation and contrivance, finagling, such that corporate identities are confused and third parties cannot be quite certain with what they are dealing.” Id.
Here, although Sun Act was a controlling shareholder of ACT, it did not own all of ACTs stock. Id. It supplied ACT with some operating funds. See Evans, 30 Mass.App.Ct. at 737. ACT conducted some business that benefitted the Defendants. See id. But here, separate corporate boundaries were maintained, and third parties did not think of themselves as dealing with Sun Capital directly. See id. Plaintiffs in this case entered into a conventional brokering sales arrangement with ACT, and were not misled into doing so on the belief it was doing business with one of the Defendants. See id.
In order to hold the Defendants liable for ACTs conduct (i.e. to succeed on Counts I, II, III, V, VI, VH, and X), ACTs corporate veil must be pierced. Defendants have shown that, as a matter of law, Plaintiffs cannot establish that the corporate veil should be pierced in this case, and therefore, the Defendant’s are entitled to summary judgment on Counts I, II, HI, V, VI, VII, and X.[10]
B. Violation of M.G.L.c. 93A, §11 (Count IX)
Under M.G.L.c. 93A, §11, “(a]ny person who engages in the conduct of any trade or commerce and who suffers any loss of money ... as a result of the use or employment by another person who engages in any trade or commerce of an unfair method of competition or an unfair or deceptive act or practice ... may ... bring an action in the superior court [for relief]...”
As discussed above, Plaintiffs cannot pierce ACTs corporate veil, and I will therefore not consider whether Defendants violated c. 93A on a piercing theory. The only other two instances that the Defendants could have otherwise violated 93A would be if the dividend payment to Sun Act or the management fee payment to Sun Management were so “unethical” or unscrupulous" that they “attained a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce.” See Wasserman v. Agnastopoulos, 22 Mass.App.Ct. 672, 679 (1986), quoting Levings v. Forbes & Wallace, Inc., 8 Mass.App.Ct. 498, 504 (1979).
Here, Congress Financial, an independent lender, approved both the declaration of the dividend to Sun Act and the payment of management fees to Sun Management. Defendants have shown that, as a matter of law, they have not breached the standard of the *20 commercial marketplace, and therefore Defendants are entitled to Summary Judgment on Count IX. See Wasserman, 22 Mass.App.Ct. at 679.
C. Knowingly and Intentionally Acting to Induce a Breach; Knowingly and Intentionally Disrupting Planiüff s Relationships with ACT (Counts X, XI)[11]
To make out a claim for tortious interference with a contract, the plaintiff must show: “(1) [plaintiff] had a contract with a third party; (2) the defendant knowingly induced the third party to break that contract; (3) the defendant’s interference, in addition to being intentional, was improper in motive or means; and (4) the plaintiff was harmed by the defendant’s actions.” Draghetti v. Chmilelewski, 416 Mass. 808, 816 (1994).
“To make a successful claim for intentional interference with advantageous relations, a plaintiff must prove that (1) he had an advantageous relationship with a third party (e.g., a present or prospective contract or employment relationship); (2) the defendant knowingly induced a breaking of the relationship; (3) the defendant’s interference with the relationship, in addition to being intentional, was improper in motive or means; and (4) the plaintiff was harmed by the defendant’s actions.” Blackstone v. Cashman, 448 Mass. 255, 260 (2007).
Since Pino, Jr.’s hearsay statements to Duffy are stricken, there is no admissible evidence on the summary judgment record that shows Defendants knowingly induced ACT to break the Sales Representative Agreement with either Supply Chain or with Estream. As a result, Defendants are entitled to summary judgment on Counts X and XI.
ORDER
For the above-mentioned reasons, the Sun Defendants’ Motion for Summary Judgment is ALLOWED.

 On November 21, 2008, ACT filed a Chapter 7 bankruptcy petition, and all claims against ACT in the present matter have been stayed. Since Count IV and VIII are claims against ACT, I will not address those claims in this motion for summary judgment.

 “EBITDA” is defined as the sum of:
[A] net income (or loss) after taxes of the Company and its direct and indirect subsidiaries on a consolidated basis (“Net Income”), plus (B) interest expense which has been deducted in the determination of Net Income, plus (C) federal, state and local taxes which have been deducted in determining Net Income, plus (D) depreciation and amortization expenses which have been deducted in determining Net Income, including without limitation amortization of capitalized transaction expenses incurred in connection with the acquisition of substantially all of the assets and assumption of certain liabilities of ACT Manufacturing, Inc. and certain of its affiliates (the "ACT Acquisition”), plus (E) extraordinary losses which have been deducted in the determination of Net Income, plus (F) uncapitalized transaction expenses incurred in connection with the ACT acquisition plus (G) all other non-cash charges, minus (H) extraordinary gains which have been included in the determination of Net Income.

 At that time, Pino, Sr. served as an ACT Board member.

 At that time, Pino, Jr. served as one of ACT’s vice presidents.

 In the interest of brevity, I have chosen not to address in detail the statements made by spokesmen for the Defendants and published in various forums (both online and in print) that Plaintiffs urge this court to consider as support for piercing the corporate veil. The statements include: (1) the March 26, 2001, Hung Tran article in “Buyouts,” entitled, “Turnaround LBO Specialists Thrive in Soft Economy”; (2) the October 2006, David Snow article in “Private Equity International” entitled, “Rising Sun”; (3) the October 2, 2008 Kambiz Foroohar article on Bloomberg.com entitled, “Blackstone, Apollo Outshone as Sun Capital Buys Boston Market”; (4) the November 27, 2009, Christine Idzelis article in, ‘The Deal Magazine,” entitled, “The Sun Also Rises”; (5) the November 5, 2010, Paul Burton article in “Investment Dealer’s Digest,” entitled, “Scratch-and-Dent Specialist.” While the statements contained in these articles are likely subject to hearsay exceptions (the articles are facts of general interest under Mass.R.Evid. 803(17) and the admissions contained therein are admissions of a party opponent under Mass.R.Evid. 801(d)(2)(d)), all of these statements concern how Defendants conducted business generally and none of them address how Defendants conducted business with respect to ACT. These articles are therefore irrelevant to the Plaintiffs’ case.

 Paragraph 11.7 of both the Estream and Supply Chain Sales Representative Agreements state:
This Agreement shall be governed by and enforced in accordance with the internal laws of the Commonwealth of Massachusetts, without regard to the choice-of-law provisions of such laws.

 Even if Delaware law applies, however, the same result would be reached, as discussed infra at note 11.

 Under Delaware law, Plaintiffs are also unable to pierce ACT’s corporate veil. In Delaware:
an alter ego analysis must start with an examination of factors which reveal how the corporation operates and the particular defendant’s relationship to that operation. These factors include whether the corporation was adequately capitalized for the corporate undertaking; whether the corporation was solvent; whether dividends were paid, corporate records kept, officers and directors functioned properly, and other corporate formalities were observed; whether the dominant shareholder siphoned corporate funds; and whether, in general, the corporation simply functioned as a facade for the dominant shareholder. United States v. Golden Acres, Inc., 702 F.Sup. 1097, 1104 (3d Cir. 1988).
“[No single factor c[an] justify a decision to disregard the corporate entity, but [ ] some combination of them [is] required, and [ ] an overall element of injustice or unfairness must always be present . . .” Id. Each of these Delaware piercing factors has already been considered in analyzing the Massachusetts piercing test. Thus, applying either Delaware or Massachusetts law, Plaintiffs cannot, as a matter of law, pierce the corporate veil.

 The parties agree that Massachusetts law applies to these claims.