H. FRANK ALBEE, administrator, *vs.* GLENN M. GLESMANN. February 12, 1987. *Doctor,* Duty to obtain patient's medical history. *Negligence, Doctor. Medical Malpractice,* Standard of care. *Practice, Civil,* Instructions to jury.

In this wrongful death action based upon allegations of medical malpractice, the entire thrust of the plaintiff's case was that in 1979 the defendant physician failed to obtain sufficient information about the decedent and his condition before advising him to discontinue his use of Inderal, an anti-cardiac arrhythmia drug which the decedent had been taking upon the advice of his pediatric cardiologist since 1972, and that, as a result of the discontinuance of Inderal, the decedent, after playing the drums with a band at a social event, collapsed and died. The jury returned a verdict for the defend-

---

ant. On appeal the plaintiff argues that the trial judge erred in instructing
the jury: "The degree of care and skill exercised by the defendant in this
case must be judged in the light of facts which were known to him in 1979.
Hindsight is not a proper basis for your evaluation of this matter." We
reverse.

There was evidence to show that in 1979 the decedent was nineteen
years of age and no longer wished to be treated by a pediatrician. On
February 9, 1979, his pediatric cardiologist wrote to the defendant, an
internist who treated adults with cardiac problems, asking that he accept
the decedent as a patient. In his letter of referral, the pediatric cardiologist
explained that although the decedent had arrhythmia, he (the pediatric car-
diologist) had not been able to "document" the type of arrhythmia from
which the decedent suffered. The pediatric cardiologist went on to express
the opinion that, in any event, the decedent "probably will not need to
continue the Inderal," that he had so informed the decedent but that the
"final decision" as to continued use of Inderal was specifically left for the
defendant to make "after you've had an opportunity to further evaluate"
the decedent. The pediatric cardiologist closed the letter with an invitation
to the defendant to consult him if he needed further information. Enclosed
with the letter was the decedent's most recent electrocardiogram.

When the decedent saw the defendant on February 16, 1979, he filled
out a three-page medical history form. Although it does not appear in this
form or in any of the defendant's notes, the defendant testified that the
decedent, during the interview, did inform him that his mother, while
playing ball in their backyard in 1970, collapsed and died. The defendant
neither consulted the pediatric cardiologist nor conducted any tests (such
as electrocardiogram, exercise, or monitoring) on the decedent before advis-
ing him to discontinue taking Inderal, avoid strenuous activity, and rest at
the first sign of any trouble. He told the decedent to call in thirty days for
an appointment. The defendant testified that he intended to give the decedent
a stress test at this second visit. The decedent did not call the defendant
for an appointment, and he died six and one-half weeks later.

A cardiologist testified on the plaintiff's behalf that in his opinion the
discontinuance of Inderal without a complete knowledge of the family and
personal history was not in compliance with the standard of care of the
average qualified internist practicing cardiology as a subspecialty in Feb-
ruary, 1979, taking into account the advances in the profession and the
resources available to the defendant. This opinion was based upon the fact
that the decedent had a history, detailed in the notes of the pediatric
cardiologist, of syncopal episodes (loss of consciousness occurring with
fright or emotional and physical distress) similar to those experienced
by his mother, who died suddenly, and that, when the decedent was on
Inderal, he did not experience these episodes, but, when off the medica-
tion, he "did have some episodes." The expert witness testified that in
his opinion the decedent suffered from a "hereditary Q-T prolongation

974          23 Mass. App. Ct.

Rescript Opinions.

syndrome," [1] that his death was the result of being taken off his medication, and that in "this particular situation in which you have a young boy who has had multiple episodes of loss of consciousness and a maternal history of sudden death . . . [the] minimal standard of evaluation for that particular individual would have been monitoring and exercise testing . . ."

One of the two doctors who testified that the defendant had acted in accordance with the appropriate standard of care was the decedent's pediatric cardiologist. His opinion was based upon the facts that when the defendant treated the decedent, there was no longer any evidence of Q-T prolongation syndrome and that the dose of medication which the decedent had been taking "would not be preventive in controlling a rhythm disturbance if it existed." The pediatric cardiologist also testified to the effect that when he wrote to the defendant in 1979, he conveyed all the pertinent and necessary information and that certain facts not recited in that letter were not important as they would not have changed the defendant's "therapeutical approach" to the decedent's problem.

Before delivering that portion of the instruction here in dispute, the trial judge repeatedly and correctly charged the jury that the standard of care and skill by which the defendant's conduct in treating the decedent was to be measured was the "standard of care and skill of the average doctor practicing that specialty, taking into account the advances in the profession and considering the medical resources available to him . . . [Y]ou are to look to the standard of care and skill in 1979, not the standard of care in May, 1985." See *Brune* v. *Belinkoff,* 354 Mass. 102, 109 (1968); *Stepakoff* v. *Kantar,* 393 Mass. 836, 840-841 (1985).

That portion of the instructions to which the plaintiff objected — "this case must be judged in the light of facts which were known to him in 1979. Hindsight is not a proper basis for your evaluation" — is erroneous because it confuses the issues of what the defendant knew or should have known in 1979 with the year as of which the standard of care was to be ascertained.

The confusing instruction was the final word heard by the jury on the issue of breach of duty. It went to the center of the plaintiff's case, that is, that the defendant violated his duty to the decedent when he undertook his treatment of the decedent without obtaining additional facts. The plaintiff objected and requested that the jury be charged that the defendant "is to be judged on the facts that were known to him *or that he should have known*" (emphasis supplied). A curative or clarifying instruction to that effect should have been given. When reviewing the instruction in light of the conflicting

---

[1] "Q-T prolongation syndrome" is a condition in which the rhythms of the heart are disturbed, the result of which is that the heart beats rapidly but no blood leaves the heart and no oxygen reaches the brain, causing a loss of consciousness and possibly death. Inderal is used to treat this condition. The drug acts to steady the heart rate and to prevent electrial impulses from reaching the heart before it is ready to receive them.

evidence, we cannot say that the error was insubstantial or inconsequential. See *Collins* v. *Baron,* 392 Mass. 565, 570-571 (1984); *Valade* v. *Consolidated Builders, Inc.,* 3 Mass. App. Ct. 519, 521 (1975). The judgment is reversed, and the case is to stand for a new trial.

*So ordered.*

*Temple Dickinson* for the plaintiff.
*John M. Dellea* for the defendant.