MAIN vs. R.J. REYNOLDS TOBACCO COMPANY, 100 Mass. App. Ct. 827

 
 JONATHAN MAIN, personal representative, [Note 1] vs. R.J. REYNOLDS TOBACCO COMPANY [Note 2] & another. [Note 3]

100 Mass. App. Ct. 827
 September 10, 2021 - April 8, 2022

Court Below: Superior Court, Suffolk County
Present: Wolohojian, Sullivan, & Ditkoff, JJ.

 

20-P-459 

Tobacco. Warranty. Wrongful Death. Practice, Civil, Instructions to jury, Objections to jury instructions, Waiver. Waiver.

This court concluded that a plaintiff's claim of error in a jury instruction at the trial of a civil action should be deemed preserved, despite the plaintiff's failure to object to the instruction before the jury retired to deliberate, where the judge employed an unusual procedure that did not give the plaintiff an opportunity to object timely either before or after the instruction. [832-834]

At the trial of a tobacco liability action claiming breach of the implied warranty of merchantability on a theory of design defect, the jury should have been instructed that the plaintiff bore the burden to prove that a reasonable alternative design was or reasonably could have been available at time of sale or distribution (a period of several decades) [834-837]; further, the erroneous instruction resulted in prejudice, where it foreclosed the jury from considering the abundant evidence from which they could have concluded that technologically feasible and practical alternative designs existed during the many years that the plaintiff's decedent smoked [837-840].

CIVIL ACTION commenced in the Superior Court Department on December 19, 2016.

 The case was tried before Heidi E. Brieger, J.

 Paula S. Bliss (Steven Rotman also present) for the plaintiff.

 Scott A. Chesin for the defendants.

 WOLOHOJIAN, J. At issue in this tobacco liability case is whether the judge correctly instructed the jury on the plaintiff's burden of proof for his breach of warranty claim, which was based on a theory of design defect. "A product is defective in design when the foreseeable risks of harm posed by the product could have been reduced or avoided by the adoption of a reasonable alternative

 Page 828 

 design and the omission of the alternative design renders the product not reasonably safe" (ellipses omitted). Evans v. Lorillard Tobacco Co., 465 Mass. 411, 424 (2013), quoting Restatement (Third) of Torts: Products Liability § 2 (b), at 14 (1998) (Third Restatement). The instruction at issue in this case told the jury that the plaintiff had to prove that a reasonable alternative design was available before Richard Main [Note 4] became addicted to cigarettes. This instruction was incorrect. Instead, the jury should have been instructed that the plaintiff bore the burden to prove that "a reasonable alternative design 'was, or reasonably could have been, available at time of sale or distribution,'" which, in this case, was a period of several decades. Evans, supra, quoting Third Restatement § 2 comment d, at 19.

 Although the plaintiff did not object to the instruction before the jury retired to deliberate, see Mass. R. Civ. P. 51 (b), 365 Mass. 816 (1974), we conclude the error should be deemed preserved because the judge employed a procedure that did not give the plaintiff an opportunity to object timely either before or after the instruction was given. We further conclude that the erroneous instruction was prejudicial because it foreclosed the jury from considering the evidence that a reasonable alternative design was or reasonably could have been available at some point during the many years Richard smoked. Accordingly, we vacate so much of the judgment as entered in favor of the defendants on the plaintiff's breach of warranty claim. We otherwise affirm the judgment. [Note 5]

 Background. In 1963 or 1964, when Richard was twelve or thirteen years old, he began smoking Kent cigarettes, which he obtained as free sample packs that were manufactured and distributed by the defendant R.J. Reynolds Tobacco Company (as successor to Lorillard Tobacco Company) (R.J. Reynolds). These free sample packs were distributed as part of a program designed to entice young people to smoke cigarettes. After about six months of smoking the Kent free samples, Richard began buying and smoking Marlboro cigarettes, which were manufactured by the defendant Philip Morris USA, Inc. (Philip Morris). By the

 Page 829 

 time Richard reached the age of sixteen or seventeen, he was smoking a pack of cigarettes per day. His smoking continued to increase, and he ended up smoking two to three packs per day for approximately twenty years. After several unsuccessful attempts, Richard finally managed to quit on New Year's Eve in 1987, at the age of thirty-six, having smoked for twenty-three years. Thirty years later, Richard died of a type of lung cancer associated with cigarette smoking.

 This suit was brought by Richard while he was still alive; after his death, it has been pursued by his son, Jonathan Main, as the representative of Richard's estate. [Note 6] As pertinent to this appeal, the suit alleges that the defendants breached the implied warranty of merchantability by manufacturing, selling, and distributing defectively designed cigarettes, and that Richard's death was caused by those design defects.

 The plaintiff has from the start acknowledged, as the Supreme Judicial Court stated in Evans, that his breach of warranty claim requires that he prove that a reasonable alternative design was available. But the parties disagreed whether the plaintiff was required to prove that a reasonable alternative design was available before Richard became addicted to cigarettes in 1965 (as the defendants argue) or at any point during the period the defendants manufactured or distributed the cigarettes Richard smoked (as the plaintiff contends). The issue was presented to the judge in the defendants' motion in limine, which sought to exclude all evidence regarding safer alternative designs after 1965 on the ground that such evidence was irrelevant and unfairly prejudicial. [Note 7] At the hearing on that motion, the plaintiff argued that Evans permitted evidence of alternative designs that may have either prevented or reduced Richard's risk of developing lung cancer; therefore, any evidence of an available safer alternative design that would have reduced that risk while Richard was a smoker was admissible. The plaintiff also noted that he planned to present evidence of safer designs that would help an addicted smoker quit, arguing 

 Page 830 

that the relevant issue was "design feasibility throughout the course of time that [Richard] was smoking that would have been safer for him" and "not just the addiction." After hearing the parties' arguments, the judge denied the defendants' motion. Although the judge did not spell out her reasons, the parties would have been justified in concluding that she denied the motion because she rejected the defendants' reading of Evans.

 Consistent with her ruling on the motion in limine, the judge permitted evidence from multiple expert witnesses regarding reasonable design alternatives both before and after the point in time at which Richard become addicted to cigarettes. [Note 8] More specifically, the plaintiff offered evidence of four safer alternative designs: a very low nicotine cigarette; a less inhalable cigarette; a cigarette utilizing technology to heat and not burn the tobacco; and a cigarette with some of the carcinogens removed. As we set out in more detail later, at least some of these alternative designs were technologically feasible before Richard started smoking. Others, however, were the result of ongoing developments and research thereafter.

 After the close of evidence, the judge held a charge conference with counsel. Among other things, the defendants requested an instruction that "the [reasonable] alternative [design] must have been available before [Richard] became addicted" to cigarettes. Again, the plaintiff argued forcefully against such an instruction, and asked that the judge reexamine Evans because "requiring [the plaintiff to] prove that there was a reasonable alternative by the time [Richard] became addicted is not product liability law in Massachusetts." But the judge expressed her intention to instruct the jury that "the alternative design must . . . have been available by the time the person developed an addiction," which she stated she based on her reading of Evans, although the judge acknowledged that she did not think Evans was particularly clear on the point.

 Also during the charge conference, the judge outlined the procedure she would employ for the parties to lodge objections to the jury instructions after they were delivered to the jury. The judge

 Page 831 

 stated that all objections to the instructions were required to be in writing, which she expected the parties to accomplish contemporaneously, and then handed to her at sidebar. She further explained:

"I will read [the written objections]. I do not want to have them read to me. I will read them myself and rule on them in a way that is I believe appropriate to either instruct the jury, limit the arguments, or do whatever is called for."

The judge did not identify how the parties were to know the other side's objections. Nor did the judge's process incorporate a mechanism for the parties to lodge objections to the other side's requests or to the judge's rulings.

 The following day, the judge delivered her final instructions to the jury. Contrary to what she had indicated during the charge conference, the judge did not instruct the jury that the plaintiff had the burden of proving a reasonable alternative design was available before Richard became addicted to cigarettes. [Note 9] The charge thus reflected what the plaintiff had argued Evans stood for.

 When she concluded her charge, the judge called the parties to sidebar and asked whether they had any objections. The plaintiff had none. The defendants, however, handed written objections and requests to the judge. The record then reflects that there was a pause during which the judge read to herself the defendants' written objections and requests. She then had the written objections marked for identification. Without further discussion, the judge gave two additional instructions to the jury, one relating to punitive damages (this instruction is not implicated in this appeal), and the following instruction (supplemental instruction):

"I did inadvertently leave out a sentence from my written charge when I was charging you on the question of design. And that is that the plaintiff must prove a reasonable alternative design was available before [Richard] became addicted."

The judge then immediately had the court officer sworn, and discharged the jury to deliberate.

 Nothing in the record suggests or indicates that the defendants' objections to the charge were shared with the plaintiff before the

 Page 832 

 judge ruled on them. Nor did the judge inform the parties how she would supplement or amend her instructions before she actually provided the supplemental instruction to the jury. And she gave no opportunity to the plaintiff to object to her supplemental instruction either (a) before it was given (in fact, there is nothing to indicate that the plaintiff at that point even knew what the judge was going to do), or (b) before the jury were discharged to deliberate. The plaintiff lodged no objection to the supplemental instruction before the jury retired to deliberate.

 The jury returned a verdict in favor of the defendants on all counts, including the claim for breach of warranty.

 Discussion. There are three issues in this appeal. The first is whether, having failed to object before the jury began deliberations, the plaintiff waived his objection to the supplemental instruction. The second is whether the supplemental instruction was an error of law. As explained further below, we decide these two issues favorably to the plaintiff. Accordingly, the third issue is whether the error was prejudicial. This issue, too, we decide favorably to the plaintiff.

 1. Waiver. Under Mass. R. Civ. P. 51 (b), "[n]o party may assign as error the giving or the failure to give an instruction unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection." "The primary purpose of the rule is to put the judge on notice of the issue, and the requirement of the rule may be satisfied in a variety of ways." Rotkiewicz v. Sadowsky, 431 Mass. 748, 751 (2000). See Shantigar Found. v. Bear Mountain Bldrs., 441 Mass. 131, 136 (2004) (issue preserved where counsel requested change to verdict slip, attempted to explain reason, judge acknowledged understanding issue, and noted objection); Rotkiewicz, supra at 751-752 (issue preserved where counsel requested instruction only at close of evidence and judge denied request, noting objection). However, a party who fails to comply with the rule or otherwise put the judge on notice of the issue forfeits the right to challenge the instruction on appeal. See Jarry v. Corsaro, 40 Mass. App. Ct. 601, 603 (1996). The defendants argue that, because the plaintiff did not lodge an objection to the supplemental instruction before the jury retired to deliberate, any objection now has been waived. The defendants also argue that plaintiff's counsel's objection to the instruction during the charge conference was too vague to put the judge on notice of the objection. We begin with the latter contention first.

 Page 833 

 As we have described above, the issue whether Evans required the plaintiff to prove that a reasonable alternative design existed before Richard became addicted to cigarettes was identified, joined, and vigorously argued at least as early as the defendants' motion in limine, which sought to exclude any evidence of alternative designs after 1965, when Richard became addicted to cigarettes. In fact, the judge's denial of that motion affected a significant portion of the expert testimony in the case because it permitted the experts to testify to the existence and feasibility of alternative designs from the first half of the twentieth century on. It was thus no surprise to anyone that the defendants attempted to limit the impact and import of that evidence by again pressing their view of the plaintiff's burden of proof at the charge conference. They accordingly submitted a proposed jury instruction, based on their reading of Evans, that the "[p]laintiff must show that [the proposed reasonable alternative design] was available by the time [Richard] developed an addiction."

 In response, plaintiff's counsel clearly argued during the charge conference that the defendants were misreading Evans, and argued that Evans permitted the jury to consider any evidence of an alternative design during the entirety of the time that Richard smoked, and not just before he became addicted. Counsel also identified the strong policy underlying the plaintiff's position: namely, that tobacco manufacturers would essentially be insulated from liability -- regardless of whether a safer product could be made -- as soon as they got a person addicted to cigarettes. The judge herself clearly understood that the plaintiff was arguing that Evans required a different instruction from that proposed by the defendants, stating, "I think . . . the alternative design must then have been available by the time the person developed an addiction. I think that is in Evans, and that's why I have it" in the instructions. The judge also recognized that her ruling would be subject to appeal. In these circumstances, we are unpersuaded by the defendants' argument that the plaintiff's objection during the charge conference was too vague to put the judge on notice of the issue. See Rotkiewicz, 431 Mass. at 751 (requirements of rule 51 [b] "may be satisfied in a variety of ways").

 It is true that the plaintiff did not renew his objection after the judge delivered the supplemental instruction, and before the jury retired to deliberate. See Flood v. Southland Corp., 416 Mass. 62, 67 (1993) (in ordinary circumstances, "[c]autious counsel . . . wisely will renew any earlier objection with specificity after the 

 Page 834 

charge"). But this failure -- if such it may even be called -- must be understood in the context of the unusual procedure the judge employed for lodging objections to the charge. That procedure did not incorporate a mechanism for either side to know the other side's objections to the charge as delivered or to know the other side's requests for supplemental instructions. Nor did the judge inform the parties how she would rule on requests and objections before acting on them. As a result, the procedure did not permit an objection to be lodged before any supplemental instruction was delivered. Finally, the judge discharged the jury to deliberate immediately after, without further discussion with counsel.

 In any event, given the clear objection during the charge conference, the judge was sufficiently on notice of the issue at the time she delivered the supplemental instruction for the plaintiff's objection to the supplemental instruction to be deemed preserved.

 2. Jury instruction. "When reviewing jury instructions to which there has been an objection, we conduct a two-part test: 'whether the instructions were legally erroneous, and (if so) whether that error was prejudicial.'" Kelly v. Foxboro Realty Assocs., LLC, 454 Mass. 306, 310 (2009), quoting Masingill v. EMC Corp., 449 Mass. 532, 540 n.20 (2007). "In examining whether an instruction adequately explain[s] the applicable law, we consider the adequacy of the instructions as a whole" (quotations and citations omitted). Governo Law Firm LLC v. Bergeron, 487 Mass. 188, 194 (2021). "An error in jury instructions is not grounds for setting aside a verdict . . . unless the result might have differed absent the error." Id., quoting Blackstone v. Cashman, 448 Mass. 255, 270 (2007).

 We begin by examining whether it was error to instruct the jury that the plaintiff bore the burden to prove that a reasonable alternative design was available by the time Richard became addicted to cigarettes. It was; the jury should have instead been told to assess whether a reasonable alternative design existed at the time of distribution or sale. Evans, which -- like this case -- involved a claim of design defect against a cigarette manufacturer, [Note 10] states that, under the so-called reasonableness or risk-

 Page 835 

utility balancing test, a plaintiff must prove that

"a reasonable alternative design 'was, or reasonably could have been, available at time of sale or distribution,' that would have reduced the foreseeable risks of harm posed by the product at reasonable cost, and that the failure to adopt the safer alternative was unreasonable" (emphasis added).

Evans, 465 Mass. at 424, quoting Third Restatement § 2 comment d, at 19.

 Using sale or distribution as the relevant point in time makes sense. If a manufacturer continues to make and sell a harmful and addictive product even though a safer alternative is available, the fact that the consumer is addicted to the product makes it more -- not less -- important for the manufacturer to adopt the available safer alternative. The purpose of anchoring liability to the point in time when the defective product is sold or distributed is to give manufacturers an incentive to create safer products. See Evans, 465 Mass. at 435 (recognizing purpose of "incentiv[izing] . . . cigarette manufacturers to make safer perhaps the most dangerous product lawfully sold in the market through reasonable alternative designs"); Third Restatement § 2 comment a, at 16 ("The emphasis is on creating incentives for manufacturers to achieve optimal levels of safety in designing . . . products"). Were we to adopt the defendants' view that liability should attach only up until the point in time a smoker becomes addicted to cigarettes, that incentive would be severely diminished, or even eliminated. Such a rule would in essence immunize cigarette manufacturers from liability to addicted persons even though they continue to sell or distribute defective products despite the availability of reasonable alternative designs. We see no reason to limit liability in this way, especially given the addictive nature of cigarettes, the speed with which smokers can become addicted to them, and the years -- if not decades -- thereafter during which a person continues to smoke and thus remains exposed to the dangers of cigarettes. In this regard, we note further that, as the expert testimony bore out, see note 12, infra, the degree or point of addiction to tobacco may be viewed as a continuum rather than a bright line. For this reason, it is all the more important that manufacturers be encouraged to produce safer, less addictive

 Page 836 

 products at all points in time so as to increase the possibility that an addicted smoker be able to quit.

 The defendants urge a contrary reading of Evans. They argue that the "rational, informed consumer" test articulated in Evans, 465 Mass. at 436-438, means that liability attaches only up to the point in time of addiction. But this is a misreading of Evans. The "rational, informed consumer" standard is used to determine whether a particular alternative design is feasible. It does not alter the point in time at which the jury are to determine whether an alternative design existed. As explained in Evans, "[t]o establish a prima facie case of defect, the plaintiff must prove the availability of a technologically feasible and practical alternative design that would have reduced or prevented the plaintiff's harm." Id. at 428, quoting Third Restatement § 2 comment f, at 24. In some circumstances, an alternative design may be feasible, but its adoption "would result in undue interference with the cost or performance of the product, thereby making the alternative unreasonable." Evans, supra at 433. In such circumstances, "whether the design alternative unduly interfered with the performance of the product [must be assessed] from the perspective of a rational, informed consumer, whose freedom of choice is not substantially impaired by addiction." Id. at 436. To hold otherwise, the court explained, would essentially eviscerate liability for manufacturers of highly addictive products because no alternative short of one that contained addictive levels of chemicals would be viewed as reasonable by addicted consumers. See id. at 435 ("We decline to place addictive chemicals outside the reach of product liability and give them special protection akin to immunity based solely on the strength of their addictive qualities").

 In sum, to prevail on a breach of warranty claim against a cigarette manufacturer based on design defect, a plaintiff must establish "that a reasonable alternative design 'was, or reasonably could have been, available at time of sale or distribution.'" Evans, 465 Mass. at 424, quoting Third Restatement § 2 comment d, at 19. In deciding whether a reasonable alternative design existed at the time of sale or distribution, the jury may consider whether the proffered design "unduly interfered with the performance of the product from the perspective of a rational, informed consumer, whose freedom of choice is not substantially impaired by addiction." Evans, supra at 436. The judge's instruction that the plaintiff was required to prove that a reasonable alternative design was available before Richard became 

 Page 837 

addicted was error. [Note 11] See id. at 439 (tobacco company defendant "does not escape liability for its defective product simply because an addicted smoker continued to use a product that sated [his] addiction rather than switch to a safer product that would not do so").

 We turn then to the issue whether the plaintiff has made a plausible showing that the jury might have reached a different result absent the erroneous instruction. See Campbell v. Cape & Islands Healthcare Servs., Inc., 81 Mass. App. Ct. 252, 258 (2012). We conclude that he has. The erroneous instruction in effect told the jury to disregard the abundant evidence from which they could have concluded that technologically feasible and practical alternative designs existed during the time Richard smoked. [Note 12]

 Specifically, the jury heard evidence of the following. The technology to remove nicotine from tobacco was available before Richard started smoking, and the processes for producing low nicotine cigarettes were developed during the time that Richard smoked. [Note 13] Dr. William Farone, who worked at Philip Morris from 1976 to 1984, first as an associate principal scientist and then as the director of applied research, testified that during his tenure, the company studied the threshold amounts of nicotine required to create addiction. From that research, the company discovered that one-tenth of one milligram of nicotine was a safe level and launched a product containing less than that amount of nicotine in 1980, while Richard was still smoking. That product had a very 

 Page 838 

efficient filter, increased ventilation, and utilized expanded tobacco.

 Dr. Farone also testified that specialty denicotinized cigarettes were developed for the president of Philip Morris, who was concerned about becoming addicted to smoking. Those cigarettes were created through a nicotine extraction method using heat, steam, water, and ammonia that was described in a 1978 research report from Philip Morris.

 The jury also heard that a low-inhalation cigarette would be "less addictive and less deadly" because it would slow the delivery of nicotine and chemicals to sensitive lung tissue. Such a low-inhalation design was technologically feasible as of 1960. Another alternative Dr. Farone investigated while at Phillip Morris was the possibility of increasing the nicotine content in cigarettes to increase the harshness of the smoke, thereby making it harder to inhale.

 The jury also heard testimony of an alternative design utilizing technology to heat, rather than burn, the tobacco to reduce the chemicals in cigarette smoke. R.J. Reynolds developed a cigarette using this technology in the 1980s and launched it in 1988, not long after Richard quit smoking.

 Finally, there was evidence of a cigarette design using different blends of tobacco to decrease carcinogens, which was technologically feasible "decades" before trial. Dr. Farone also explained that in the 1970s and 1980s, less toxic blends were available than those utilized by Philip Morris in Marlboro cigarettes.

 We recognize that the defendants extensively challenged this evidence at trial. However, the evidence of alternative designs was of sufficient strength and extent that a reasonable jury could have concluded that the defendants sold or distributed defective products to Richard during some or all of the time that he smoked, and that the available alternative designs would have reduced or prevented Richard's risk of developing lung cancer. See Abramian v. President & Fellows of Harvard College, 432 Mass. 107, 119 (2000) (where evidence permitted different finding absent erroneous instruction, "the question properly is one for the jury"). As a result, where the erroneous instruction unduly limited the scope of the jury's inquiry on this issue, we conclude that prejudice resulted. See Governo Law Firm LLC, 487 Mass. at 196-197 (prejudice shown where erroneous instruction told jury to disregard defendants' conduct important to plaintiff's G. L. c. 93A claim); Blackstone, 448 Mass. at 270 (prejudice shown where

 Page 839 

 instruction "unduly narrowed the range of the jurors' consideration").

 The defendants argue that the instruction was not prejudicial because it was only a single sentence in the judge's otherwise lengthy instructions. However, we cannot disregard that the erroneous instruction stood alone, was delivered separately from the other instructions, and was the last word the jury heard on the plaintiff's burden of proof before they retired to deliberate. See Albee v. Glesmann, 23 Mass. App. Ct. 972, 974 (1987) (judgment reversed where "confusing instruction was the final word heard by the jury on the issue of breach of duty" and "[i]t went to the center of the plaintiff's case"). Furthermore, the impact of the erroneous instruction was amplified by Philip Morris's closing argument, which emphasized that the plaintiff could not meet his burden of proof by offering evidence of alternative designs after 1965. [Note 14]

 Finally, the defendants argue that no prejudice resulted from the erroneous instruction because the jury found no causation. This argument is based on the jury's unnecessary response to a question on the special verdict slip. [Note 15] Even were we to take the unsolicited response into account, it would not change our view 

 Page 840 

of the prejudicial impact of the erroneous instruction. This is because the erroneous instruction may well have affected the jury's determination on causation, in addition to affecting the jury's view of breach. Having found no breach (a determination that may have been influenced by the erroneous instruction), the jury's conclusion that a design defect was not a substantial contributing factor of Richard's lung cancer or death naturally would have followed. Given the conflicting testimony at trial on the issue of causation, we cannot say what, if anything, the jury would have found with respect to that issue had they been properly instructed on breach. [Note 16] As a result, the proper course is to vacate the judgment as to the breach of warranty claim and remand for a new trial. See Blackstone, 448 Mass. at 271 (prejudice shown where jury's answer to special question not conclusive finding on issue subject to erroneous instruction). See also Abramian, 432 Mass. at 119 ("verdict . . . cannot stand" where due to erroneous instruction, "we cannot ascertain on which theory the jury relied" [citation omitted]); Slate v. Bethlehem Steel Corp., 400 Mass. 378, 384 (1987) (judgment reversed where "we do not know whether the verdicts were based on the improper instruction").

 Conclusion. So much of the judgment as entered in favor of the defendants on the breach of warranty claim is vacated and the matter is remanded to the Superior Court for further proceedings consistent with this opinion. The judgment is otherwise affirmed.

So ordered.

FOOTNOTES
[Note 1] Of the estate of Richard Main. 

[Note 2] Individually and as successor by merger to Lorillard Tobacco Company. 

[Note 3] Philip Morris USA, Inc. 

[Note 4] We refer to Richard Main as Richard, and we refer to Jonathan Main, personal representative of the estate of Richard Main, as the plaintiff. 

[Note 5] The plaintiff also brought claims against the defendants for negligence and civil conspiracy. Because the plaintiff makes no argument regarding these claims on appeal, we affirm so much of the judgment as entered for the defendants on them without further discussion. 

[Note 6] Jonathan Main amended the complaint to assert claims under the wrongful death statute, G. L. c. 229, § 2. 

[Note 7] In their written motion, the defendants asserted a different ground, instead relying on the deposition testimony of the plaintiff's causation expert (Dr. David C. Christiani) that Richard would have been unlikely to develop lung cancer from smoking if he quit in 1966. However, the defendants abandoned that argument at the hearing on the motion, explaining that they were not relying on Dr. Christiani's testimony to establish the 1966 date. 

[Note 8] The plaintiff presented two expert witnesses on the issue of cigarette design (Dr. Kenneth Michael Cummings and Dr. William Farone) and the defendants each presented one who testified on the subject (Richard Jupe and Dr. Ryan Potts). In addition, Dr. Christiani was permitted to briefly testify about alternative cigarette designs after Philip Morris pursued that line of questioning on cross-examination. See note 7, supra. 

[Note 9] The parties were not provided with a written copy of the final charge in advance. 

[Note 10] "A seller breaches its warranty obligation when a product that is defective and unreasonably dangerous for the ordinary purposes for which it is fit causes injury." Laramie v. Philip Morris USA Inc., 488 Mass. 399, 413 n.12 (2021), quoting Haglund v. Philip Morris Inc., 446 Mass. 741, 746 (2006). Cigarettes may be defective and unreasonably dangerous based on a theory of defective design. See Evans, 465 Mass. at 422. 

[Note 11] We understand that jury instructions given in other tobacco liability cases in the Superior Court reflect some confusion about how to apply Evans. 

[Note 12] We note that the defendants urge us to accept 1965 or 1966 as the date of addiction and assess the plaintiff's evidence of alternative designs only from that point forward on the issue of prejudice. The evidence of addiction at trial was not so definitive. Rather, the plaintiff's addiction expert opined that Richard's use of Kent cigarettes "initiated" the addiction process, but the expert could not pinpoint "the exact day, hour, year that the switch goes on and say that's when he's addicted." The expert also explained that adolescents are more susceptible to addiction because their frontal lobes are not yet fully developed. Because we cannot speculate as to the date that the jury considered Richard to be an addicted smoker and because the jury were erroneously instructed that the date of addiction was relevant to the claim, we consider the totality of the evidence of alternative designs presented to the jury. However, we would reach the same conclusion even if we only considered the evidence from 1966 forward. 

[Note 13] The testimony was that using "very low nicotine" cigarettes would be less likely to lead to addiction and that regular smokers using such cigarettes would smoke less. 

[Note 14] In closing, Philip Morris's counsel stated: 

"This is what Mr. Main must prove. Again, this is the law in the Commonwealth.

"And this instruction is particularly important, given the time period that the plaintiff claimed Mr. Main became addicted, which is by 1965.

"They can't meet this burden through suggestions about what would have been possible in the '70s, the '80s, the '90s, the 2000s, or even today.

"And that's why Dr. Farone's testimony, including this thing about [the president of Philip Morris] that he talks about, it doesn't help them meet their burden of proof because Dr. Farone's testimony was limited between 1976 and 1984. And under the law, they have to go to 1965.

"The question is whether these hypothetical products could have been made and made in a way that people would accept them before 1965. That is the key here."

[Note 15] The jury answered "[n]o" to the question, "Did RJ Reynolds or Philip Morris breach the implied warranty of merchantability by selling defectively designed and unreasonably dangerous Kent and Marlboro cigarettes to Richard Main?" Because the jury's answer to that question was dispositive on the breach of warranty claim, they were instructed not to answer the next question, "For any defendant whose product you found was defectively designed and unreasonably dangerous, was the design defect a substantial contributing factor in causing Mr. Main's lung cancer and death?" Although instructed not to answer this question, the jury nonetheless answered it "[n]o." 

[Note 16] The defendants challenged causation by asserting that radon exposure was a potential cause of Richard's lung cancer, and by presenting evidence that smoking was not the likely cause given Richard's age when he quit and the number of years that passed between the time Richard quit and his diagnosis. 

 
 Home/Search 
 Table of Cases by Citation
 Table of Cases by Name 
 

 Commonwealth of Massachusetts. Trial Court Law Libraries. Questions about legal information? Contact Reference Librarians.